IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TARA SCOTT and WILSON CARTER, INDIVIDUALLY AND AS TRUSTEE OF THE BAILEY MIDDLETON CARTER 2009 TRUST, THE MARY WILSON CARTER 2009 TRUST, and THE WILSON M. CARTER 1998 TRUST,<br><br>    Plaintiffs,<br><br>    v.<br><br>VANTAGE CORPORATION, VANTAGE ADVISORY MANAGEMENT, LLC, VF(X) LP, TRADELOGIX, LLC, BRIAN ASKEW and GERALD FINEGOLD,<br><br>    Defendants. | ) ) ) ) ) ) ) ) ) ) ) C.A. No. 17-448-MPT ) ) ) ) ) ) ) |

**MEMORANDUM**

**I.     Introduction**

Defendants/counterclaim-plaintiffs Vantage Corporation ("Vantage"), Brian Askew ("Askew"), and Gerald Finegold ("Finegold") filed their counterclaims pursuant to FED. R. CIV. P. 13 against plaintiffs/counterclaim-defendants Tara Scott ("Scott), and Wilson Carter ("Carter"), both individually and as Trustee of the Bailey Middleton Carter 2009 Trust, the Mary Wilson Carter 2009 Trust, and the Wilson M. Carter 1988 Trust. Currently before the court are plaintiffs' motion to dismiss defendants' counterclaims pursuant to FED. R. CIV. P. 12(b)(6).[1]

---

[1] D.I. 26 and D.I. 33.

## II. BACKGROUND

Vantage, a privately-held Delaware corporation, maintains its principal office in Alpharetta, Georgia.[2] Askew, Finegold, and Carter are citizens of Georgia, while Scott is a resident of Colorado.[3]

Since the early 1990s, defendants have invested and worked together to create and enhance sophisticated proprietary trading software.[4] In March 2014, defendants formed Vantage and TradeLogix LLC ("TradeLogix"), a wholly owned subsidiary of Vantage that engages in trading using their proprietary trading software.[5]

In late 2015, Carter approached Askew to become a potential investor, and also introducing Scott.[6] Scott made clear she spoke with Carter about investing and expressed the ability and desire to fund a substantial dollar investment.[7] Carter and his advisors sought investing information from Vantage, who provided documentation concerning investments, including documents seeking confirmation that each was an accredited, sophisticated investor with the ability to invest.[8] Plaintiffs represented an understanding and acumen to assess the investments, and represented an understanding they would receive shares of Vantage which had no public market for resale and were illiquid.[9]

Plaintiffs were informed their investments would be utilized for Vantage

---

[2] D.I. 26 at ¶ 1.
[3] *Id.* at ¶ 3-5.
[4] *Id.* at ¶ 8.
[5] *Id.* at ¶ 9-10.
[6] *Id.* at ¶ 11.
[7] *Id.* at ¶ 12.
[8] *Id.*
[9] *Id.*

2

operations, a portion of which would be placed in Vantage's trading account to generate additional funds utilizing its proprietary trading technology.[10] Those funds would operate its business if needed.[11]

Plaintiffs received and executed a Stock Subscription Agreement, advising: (1) the number of shares of Class A common stock acquired and price per share of $2,096.60; (2) the investor's recognition that the stock was not registered and could not be sold or distributed without registration; (3) there was no public market for the shares and no assurance there would be; and (4) the company had no obligation to register the shares.[12]

Further, the Stock Subscription Agreement represented and warranted that plaintiffs: (1) understood the nature of the investments; (2) had sufficient financial resources to bear the risk of their investment in Vantage stock; (3) were sufficiently experienced in financial and business matters to understand the merits and risks of investing in a private company; and (4) were purchasing the Stock for investment purposes and understood that their shares could not be sold without registration.[13] Defendants relied on plaintiffs' representations and warranties when they sold shares of Vantage stock to them.[14] Critical to Vantage were investors that shared the same long-term views and would not have near-term liquidity needs inconsistent with its goals.[15]

---

[10] *Id.* at ¶ 13.
[11] *Id.*
[12] *Id.* at ¶ 14.
[13] *Id.* at ¶ 15.
[14] *Id.* at ¶ 16.
[15] *Id.*

Plaintiffs also signed individual Joinder Agreements, whereby they were joined and became a party to the Amended and Restated Stockholders Agreement dated January 1, 2016, between Vantage and the other shareholders.[16] The Stockholders Agreement contained a general restriction on the transfer of plaintiffs' shares, along with a clause titled "Further Assurances", in which plaintiffs agreed to "cooperate and take such action as may be reasonably requested in order to carry out the provisions and purposes of this Agreement and the transactions contemplated by this Agreement."[17]

Additionally, plaintiffs agreed to a remedies clause in the Stockholders Agreement, which provided that "if any party to this Agreement breaches or threatens to commit a breach . . . such Stockholder shall pay, indemnify and hold the Company harmless from all reasonable costs, damages, and expenses, including attorneys' fees, expended or incurred by the Company."[18]

Plaintiffs received a Term Sheet with their investments made in an offering of $5 to $15 million of shares of class A common stock in Vantage.[19] The price was $2,096.60 per share and the "[s]hares [were] being offered only to accredited investors."[20] The Term Sheet described the "Use of Proceeds" of the January 2016 Offering as: "[p]roceeds from the investment will be used to execute proprietary trading strategy and for working capital and other general corporate purposes."[21] Investors,

---

[16] *Id.* at ¶ 17.
[17] *Id.* and D.I. 35-1 at 10-11.
[18] D.I. 26 at ¶ 18; D.I. 35-1 at 11.
[19] D.I. 26 at ¶ 19.
[20] *Id.*
[21] *Id.*

4

including plaintiffs, received share certificates each time they purchased stock.[22]

In 2016, Vantage formed an additional subsidiary, Vantage Advisory Management, LLC ("Advisory"). Advisory is the general partner of a hedge fund, VF(x) LP, also formed in 2016, and utilized Vantage's proprietary trading software.[23] Defendants claim investors, including Scott, desired to become limited partners and invest in the VF(x) LP hedge fund.[24] After making four separate purchases of stock in Vantage totaling $2 million, Scott invested $250,000 in the hedge fund.[25] VF(x) had a liquidity provision requiring a one-year commitment with a 90-day notification as a condition precedent for redemption.[26] Scott received quarterly statements from Trident Fund Services, the fund administrator, detailing the activity of her investment after active trading began in September 2016.[27]

Within six months of her purchase, Scott sought liquidity.[28] Her initial requests were to discuss Vantage's daily business activity.[29] However, Scott soon escalated to demanding that $1 million of her $2 million investment be moved from Vantage to VF(x), which had liquidity rights.[30] These requests were made notwithstanding documentation provided to her, and other communications reiterating that she held stock in a privately held corporation that had no ready market and no redemption rights.[31] Scott was made

---

[22] *Id.* at ¶ 20.
[23] *Id.* at ¶ 22.
[24] *Id.* at ¶ 23.
[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] *Id.* at ¶ 24.
[29] *Id.*
[30] *Id.*
[31] *Id.* at ¶ 25.

5

aware that her investment was already being used as part of the operational reserve for Vantage.[32] If granted, Scott's demands to redeem her stock would allegedly deplete Vantage's operations reserves.[33]

However, Vantage acquiesced in the Fall 2016 to Scott's demands, selling half of the $1 million in funds Scott was seeking to redeem.[34] Scott re-sold a portion of her Vantage Class A shares to new investors for a total of $500,000.[35] She then expanded her demands, requesting Vantage buy back her shares for the remainder of her $2 million investment.[36] Defendants claim her unrelenting communications became so distracting to daily operations and management that even Carter reminded her that the investment in Vantage was a long term endeavor requiring patience, that no promises were made to repay her investment or a rate of return in the short term, and chastised her for attempting to extract a premium for an unanticipated very early redemption.[37]

Askew suggested that there was liquidity in VF(x) LP and her commitment of a one year and 90-day redemption notice could be waived to provide liquidity.[38] Scott refused, stating she wanted to keep her investment in the hedge fund, VF(x), but wanted a return of the monies she paid for shares in Vantage.[39] Since her interests were not aligned with other investors, and after notice, Advisory exercised its right to

---

[32] *Id.*
[33] *Id.* at ¶ 26.
[34] *Id.*
[35] *Id.*
[36] *Id.* at ¶ 27.
[37] *Id.*
[38] *Id.* at ¶ 28.
[39] *Id.*

redeem Scott's interest in the hedge fund.[40]  Advisory directed the fund administrator to return Scott's principal and interest investments in VF(x) LP, in which she received the amount of $250,000 and profit of $6,639.47.[41]

In mid-December 2016, Carter told Askew he was in urgent need of liquidity because his spending had outstripped his income.[42]  Carter was reminded there was no ready market for his Vantage shares and no immediate buyer.[43]  Carter asked if he could remove at least $1 million which he needed in a few days.[44]  He then became increasingly hostile when he was unable to liquidate or sell his stock.[45]  Plaintiffs were aware that their stock in Vantage was illiquid and they had no right to seek redemption of their shares.[46]  Further, they were informed that redeeming their shares would result in substantial diminution of the remaining capital reserves and risked on-going viability and ability to succeed on its strategic plans.  As a result, Vantage could not redeem their shares.[47]

Plaintiffs were informed that Vantage had been engaged in discussions with potential investors for over a year and were close to completing another deal that would benefit Vantage shareholders, in that this business dealing created a potential opportunity for an investor to purchase their shares.[48]  Despite this information, plaintiffs

---

[40] *Id.* at ¶ 29.
[41] *Id.*
[42] *Id.* at ¶ 30.
[43] *Id.* at ¶ 31.
[44] *Id.*
[45] *Id.*
[46] *Id.* at ¶ 32.
[47] *Id.*
[48] *Id.* at ¶ 34.

7

allegedly accelerated their demands and threats to force Vantage to acquiesce, and to capitulate to their redemption demands for all of their stock.[49]

Defendants maintain plaintiffs, through legal counsel, threatened to involve governmental authorities unless their shares were redeemed immediately, as well as a lawsuit.[50] Vantage made clear that if plaintiffs engaged in such action, it would detrimentally affect on-going, long-developed dealings meant for the benefit of all shareholders, including investments in Vantage and its hedge fund and other significant opportunities involving Vantage's proprietary trading technology.[51]

Plaintiffs filed this lawsuit, naming defendants.[52] Plaintiffs' actions allegedly damaged Vantage's ability to conduct business and proceed with business opportunities, to the detriment of Vantage and its other shareholders, diminished the value of Vantage shares, and cost Vantage significant legal expenses in its defense.[53] Defendants purport the threats and actions of plaintiffs breached the Stockholder Agreement.

### III. Governing Law

#### A. Motion to Dismiss

In analyzing a motion to dismiss under FED. R. CIV. P. 12(b)(6), a review of Rule 8(a)(2) is necessary. It requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief."[54] That standard "does not

---

[49] *Id.* at ¶ 35.
[50] *Id.* at ¶ 36.
[51] *Id.* at ¶ 37.
[52] *Id.* at ¶ 38.
[53] *Id.* at ¶ 40.
[54] FED. R. CIV. P. 8(a)(2).

require 'detailed factual allegations,' but . . . demands more than an unadorned, the-defendant-unlawfully-harmed me accusation."[55] Thus, to survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"[56] The purpose of a Rule 12(b)(6) motion to dismiss is to test the sufficiency of the complaint, not to resolve disputed facts or decide the merits of the case.[57] Evaluating a motion to dismiss under Rule 12(b)(6) requires the court to accept as true all material allegations of the complaint.[58] "The issue is not whether a plaintiff will ultimately prevail, but whether the complaintant is entitled to offer evidence to support the claims."[59] A motion to dismiss may be granted only if, after, "accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to the plaintiff, plaintiff is not entitled to relief."[60]

To survive a motion to dismiss under Rule 12(b)(6), the factual allegations must be sufficient to "raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."[61] A plaintiff is obliged "to provide the 'grounds' of his entitle[ment] to relief" beyond "labels and

---

[55] *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007)).
[56] *Id.* (quoting *Twombly*, 550 U.S. at 570); *see also* Fed R. Civ. P. 12(b)(6).
[57] *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).
[58] *Spruill v. Gillis*, 372 F.3d 218, 223 (3d Cir. 2004).
[59] *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (internal quotation marks and citations omitted).
[60] *Maio v. Aetna, Inc.*, 221 F.3d 472, 481-82 (3d Cir. 2000) (internal quotation marks and citations omitted).
[61] *Twombly*, 550 U.S. at 555; *see also Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007).

conclusions."[62] Heightened fact pleading is not required: rather "enough facts to state a claim to relief that is plausible on its face" must be alleged.[63] Rejected are unsupported allegations, "bald assertions," or "legal conclusion."[64] Further, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions."[65] The analysis is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[66] Well-pled facts which only infer the "mere possibility of misconduct" do not show that "the pleader is entitled to relief" under Rule 8(a)(2).[67] "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief."[68]

## IV. Analysis

### A. Motion to Dismiss Defendants' Counterclaims (D.I. 33)

#### 1. Breach of Contract (Count I)

In order to succeed on a breach of contract claim under Delaware law,

---

[62] *Twombly*, 550 U.S. at 555.
[63] *Id.* at 570.
[64] *Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice."); *see also Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) ("[A] court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss.") (citations omitted); *Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997) ("unsupported conclusions and unwarranted inferences" are insufficient.); *Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1996) (allegations that are "self evidently false" are not accepted.).
[65] *Iqbal*, 556 U.S. at 678; *see also Twombly*, 550 U.S. at 555 (A court is "not bound to accept as true a legal conclusion couched as a factual allegation.").
[66] *Iqbal*, 556 U.S. at 679.
[67] *Id.*
[68] *Id.*

defendants must plead: "(1) a contractual obligation; (2) a breach of that obligation by plaintiffs; and (3) resulting damage to defendants."[69] In the instant case, plaintiffs contend defendants' breach of contract claim fails as a matter of law, because defendants cannot demonstrate the existence of an enforceable contractual obligation not to seek rescission.

Plaintiffs maintain any provision that preemptively bars this action is an illegal waiver of their rights in violation of federal securities laws, and the agreements are unenforceable under Georgia securities statutes.[70] Further, any provision that bars an investor from exercising his or her statutory rights has been deemed illegal since the adoption of the Securities Act of 1933 and the Securities Exchange Act of 1934.

Section 29 of the 1934 Securities Exchange Act "is not intended to protect substantive rights created by contract. It is designed to protect rights created by the Exchange Act, and it expressly forecloses contracting parties from 'defin[ing] the boundaries of the[ir] transaction' in a way that relieves a party of the duties imposed by that Act."[71]

Section 29 further provides that: "every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, . . . [or] the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be

---

[69] *Freudenberg Spunweb Co. v. Fibervisions L.P.*, 2006 WL 1064173, at *18 (Del Super. 2006), *quoting H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003).
[70] D.I. 34.
[71] *AES Corp. v. Dow Chem. Co.*, 325 F.3d 174, 183 (3d Cir. 2003).

void."

However, "Section 29 itself does not define a substantive violation of the securities laws; rather, it is the vehicle through which private parties may rescind contracts that were made or performed in violation of other substantive provisions."[72] Although the word "void" is contained in the statute, the Supreme Court has read Section 29(b) to be "merely voidable at the option of the innocent party."[73]

To void the Agreement under Section 29, plaintiffs must establish: "(1) the contract involved a prohibited transaction; (2) they are in contractual privity with defendants; and (3) plaintiff is in the class of persons that the securities acts were designed to protect.[74] Plaintiffs must demonstrate "a direct relationship between the violation at issue and the performance of the contract; i.e., the violation must be 'inseparable from the performance of the contract' rather than 'collateral or tangential to the contract.'"[75]

Plaintiffs assert that they are entitled to rescind the Agreement under Section 29 of the Exchange Act based upon a violation of the Securities Act. The Agreements however, do not involve prohibited transactions. The Agreements are detailed outlines regarding nature and understanding of the investments, the investment goals, and binds the parties to act in furtherance of those goals.

---

[72] *See National Union Fire Ins. Co. v. Turtur*, 892 F.2d 199, 206 n.4 (2d Cir. 1989).
[73] *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 387-88, 90 S. Ct. 616, 24 L. Ed. 2d 593 (1970).
[74] *Regional Properties, Inc. v. Financial and Real Estate Consulting Co.*, 678 F.2d 552, 559 (5th Cir. 1982); *see also, Pompano-Windy City Partners, Ltd. v. Bear Stearns & Co., Inc.*, 794 F. Supp. 1265, 1288 (S.D.N.Y. 1992).
[75] *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 201 (3d Cir. 2001).

Defendants pleaded sufficient facts to establish a contractual obligation. Defendants claim plaintiffs breached the Stock Subscription Agreement and Stockholders Agreement when they invested based upon stated and agreed investment goals, liquidity needs, investment knowledge and understanding of the stock investments purchased. Defendants further claim, plaintiffs improperly demanded refunds of their investments contrary to the agreed terms of their investment and attempted to tender back their Vantage stock. Defendants further purport plaintiffs failed and refused to cooperate with Vantage in contravention of the terms of the Stockholders Agreement, and instead demanded redemption of their shares, threatened Vantage and others with legal action, and filed this lawsuit. As a result, defendants allege sufficient facts to show a breach of Section 5.10 of the Stockholders Agreement.

### 2. Breach of Express Warranty (Count II)

To succeed on a breach of express warranty claim, defendants must plead that a warranty existed, breach of the warranty, and resulting damages. An express warranty is created by: (1) an affirmation of fact or promise made by the seller (2) to the buyer (3) which relates to the goods and (4) becomes part of the basis of the bargain.[76]

Defendants maintain plaintiffs breached their representations and warranties contained in the Stock Subscription Agreement. Defendants argue that plaintiffs knew at this time of their investments how they would be used, and understood they would be unable to liquidate or sell their stock. However, plaintiffs demanded redemption of their shares of Vantage stock, threatened legal action, and filed this action seeking rescission

---

[76] *Freudenberg Spunweb Co. v. Fibervisions L.P.*, 2006 WL 1064173, at *17-18 (Del. Super 2006).

13

of their purchases of Vantage stock and return of their consideration, plus interest.

Defendants further allege that they relied on each and every representation by plaintiffs when agreeing to issue Vantage stock and are entitled to damages as a result.

Plaintiffs contend defendants are attempting to restate their breach of contract claim as breach of express warranty. As evident from the extent to which defendants explained the bases of their breach of express warranty claim, they satisfy the pleadings requirements of Rules 8 and 12(b)(6).

### 3. Implied Covenant of Good Faith & Fair Dealing (Count III)

> Under Delaware law, an implied duty of good faith and fair dealing is interwoven into every contract. When used in conjunction with an implied covenant, the term 'good faith' contemplates 'faithfulness to the scope, purpose, and terms of the parties' contract.' In order to plead successfully a breach of an implied covenant of good faith and fair dealing, the plaintiff must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff.[77]

A court focuses on "the parties' reasonable expectations at the time of contracting. However, the express terms of the contract, and not an implied covenant of good faith and fair dealing, will govern the parties' relations when the terms expressly address the issue . . . [T]he plaintiff must advance provisions of the agreement that support this finding in order to allege sufficiently a specific implied contractual obligation."[78]

> When presented with an implied covenant claim, a court first must engage in the process of contract construction to determine whether there is a gap that needs to be filled. If a gap exists, the court must determine whether the implied covenant should be used to supply a term to fill the

---

[77] *Walgreen v. Theranos, Inc.*, 2017 WL 3189006, at *5 (D. Del. 2017).
[78] *Id.*

14

gap. Delaware courts will only imply contract terms when "the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected. Thus, parties are liable . . . when their conduct frustrates the 'overarching purpose' of the contract . . . .[79]

Defendants claim by entering into the Stockholders Agreement and the Stock Subscription Agreement, plaintiffs are subject to an implied covenant of good faith and fair dealing in their relationship with defendants. Therefore, plaintiffs are required to refrain from unreasonable and arbitrary conduct that prevents defendants from receiving the fruits of the bargain under the Agreements.

Defendants have pled sufficient facts to assert claims for breach of implied covenant of good faith and fair dealing, by alleging facts that show plaintiffs' conduct frustrated the overarching purpose of the Agreements.

### 4. Negligent Misrepresentation (Count IV)

Under Delaware law, "in order to assert a tort claim along with a contract claim, a plaintiff must generally allege that a defendant violated an independent legal duty, apart from the duty imposed by contract."[80] "Negligent misrepresentation arises when a representation made is false, of which the actor knew or should have known, and upon which the plaintiff reasonably and detrimentally relied."[81]

Defendants claim plaintiffs made negligent misrepresentations when entering into the Agreements. Plaintiffs represented to defendants that they had sufficient financial

---

[79] *Id.* at 5-6.
[80] *Hiller & Assocs., LLC v. Garden Fresh Rests., LLC*, 2018 WL 3768989, at *12 (D. Del. 2018).
[81] *RAIT P'ship, L.P. v. Fieldstone Lester Shear & Denberg, LLP*, 2009 WL 3297310, at *7 (D. Del. 2009), *report and recommendation adopted* 2010 WL 786551 (D. Del. 2010).

15

resources to be able to bear the risk of their investment in Vantage; had evaluated the merits and risks of investing in Vantage, a private company; were committed to purchase of shares that could not be sold without registration and subject to transfer restrictions; agreed investments would be used for operational functions of Vantage; and agreed to cooperate in order to carry out the provisions and purposes of the Stockholders Agreement.

Plaintiffs contend defendants fail to plead their claim of negligent misrepresentation with particularity, and this claim is barred by the economic loss doctrine. "The economic loss doctrine is a judicially created doctrine that allows a party to recover in tort only if losses are accompanied by bodily harm or property damage; in other words, the doctrine prevents plaintiffs from recovering in tort for losses suffered that are solely economic in nature."[82] This court recognizes that "a plaintiff may plead a negligent misrepresentation claim by showing the defendant supplied information for use in transactions with third parties and is in the business of supplying information."[83]

Defendants fail to adequately plead a claim for negligent misrepresentation against plaintiffs. Defendants did not sufficiently allege that plaintiffs were in the business of supplying information nor did they allege sufficient facts that demonstrate plaintiffs violated an independent legal duty, outside from their obligations imposed by the Agreements.

### 5. Individual Breach of Contract (Count V)

---

[82] *Cavi v. Evolving Sys., Inc.*, 2017 WL 658470, at *7 (D. Del. 2017), *report and recommendation adopted in part*, 245 F. Supp. 3d 604 (D. Del. 2017).
[83] *Id.*

16

"To survive a motion to dismiss for failure to state a breach of contract claim, a plaintiff must demonstrate the existence of the contract, the breach of an obligation imposed by that contract, and the resultant damage to the plaintiff. Clear and unambiguous language found in a contract is to be given its ordinary and usual meaning."[84]

Defendants claim Scott individually breached the Release Agreement executed on October 24, 2016. She executed a stock transfer, a power of attorney to transfer the stock and a release agreement, whereby she agreed to and acknowledged to "release, remise, acquit and forever discharge [Vantage] . . . from any and all rights, demands, claims, damages, losses, costs, expenses, actions and causes of action whatsoever . . . ." She further agreed to "giving up rights, if any, which Transferor may have under federal, state, or municipal law, and is hereby covenanting not to file complaints or lawsuits or to assert any claims against the releases arising hereunder."

Scott contends her claim only applies to the sale of 119.240675 shares of Vantage to David Lawrence, and maintains she did not release defendants from liability for the claims brought in the instant matter. As noted above, defendants pled sufficient facts to state a claim for breach of the individual contract by Scott pertaining to the release agreement.

### 6. Breach of Fiduciary Duties (Count VI)

"In order to assert a claim of breach of fiduciary duty, a plaintiff must show that a

---

[84] *Walgreen, Co. v. Theranos, Inc.*, 2017 WL 3189006, at *5 (D. Del. July 27, 2017).

fiduciary duty exists and the defendant breached that duty.  Upon showing of a fiduciary relationship, Delaware law recognizes a 'triad of fiduciary duties to uphold:  the duty of care, loyalty and good faith.'"[85]  Defendants failed plead to adequate facts that would indicate a partnership existed.

Defendants dispute the truth and validity of the existence of any partnership agreement, oral or written in its counterclaims.  However, they maintain, if this court were to find that defendants agreed to a partnership, plaintiffs would become general partners, and owe defendants all of the duties and obligations imposed by law.

Defendants alleged that plaintiffs conspired to develop a scheme to obtain money or take control of their business, and further assert that plaintiffs claimed to be general partners, and to own defendants' companies, intellectual property, and the revenue streams.

Defendants contend Scott voluntarily elected to join Carter's conspiracy to steal their property, or alternatively, was fraudulently induced by Carter to join in his efforts to obtain money and items of value from defendants.  Defendants further allege plaintiffs kept their scheme secret, disparaged defendants and their businesses, and deprived them from being able to attract needed capital investment, starving defendants until they acquiesced to plaintiffs' demands.

Plaintiffs maintain that this counterclaim by defendants does not establish the existence of a fiduciary duty, because it fails to establish a partnership.  They further assert that defendants incorrectly claim that plaintiffs somehow attempted to become

---

[85] *Cavi v. Evolving Sys., Inc.*, 2017 WL 658470, at *5 (D. Del. 2017), *report and recommendation adopted in part*, 245 F. Supp. 3d 604 (D. Del. 2017).

general partners.  Plaintiffs purport they clearly stated that although defendants falsely represented to plaintiffs that they would become general partners upon the purchase of stock, plaintiffs never became general partners of any Vantage related entity.

Defendants fail to plead adequate facts that would establish a partnership agreement, therefore, fail to establish the existence of a fiduciary duty.  Defendants claim for breach of fiduciary duty is dismissed.

### 7. Prima Facie Tort Claim (Count VII)

A prima facie tort claim requires "(1) an intentional lawful act by the defendant; (2) defendant's intent to injure plaintiff; (3) an absence of justification or an insufficient justification for defendant's act; and (4) injury to plaintiff."[86]

A prima facie tort claim exists "for persons harmed by acts that are intentional and malicious but otherwise lawful which fall outside of the rigid traditional intentional tort categories."[87]  Here, defendants allege plaintiffs' conspiring actions were intentional, done without excuse or justification, but with malice and intent to cause harm and injury, and, as a natural, direct and proximate result of the plaintiffs' tortious actions, defendants sustained actual, incidental and consequential damages in a presently undetermined amount.  Defendants have not pled enough facts to state a claim for relief that is plausible on its face.  Defendants' allegations are unsupported legal conclusions.

### 8. Alternative Recovery (Count VIII)

Defendants maintain they are entitled to recover against plaintiffs under theories

---

[86] *Hornsby v. Thomasville Noteholder, LLC*, 2014 WL 3810665, at *3 (M.D. Ga. Aug. 1, 2014).
[87] *Id.*

of contract, implied contract, quasi-contract, unjust enrichment and quantum meruit. However, defendants failed to plead sufficient facts to establish these claims. Defendants argue that they devoted personal time, effort and incurred significant expense to create the entities, intellectual property and assets involved, which plaintiffs claim to own.  Defendants further maintain that, if a partnership exists between defendants and plaintiffs, then defendants conferred a benefit upon this alleged partnership.  However, defendants have not alleged facts to support these theories, and because defendants failed to plead sufficient facts to establish the aforementioned partnership, their alternative recovery argument is insufficiently pled.

    A Judgement Order consistent with this Memorandum shall follow.

Dated: November 13, 2018                  <u>/s/ Mary Pat Thynge       </u>
                                                        Chief U.S. Magistrate Judge