# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TARA SCOTT, ET AL., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| VANTAGE CORPORATION, ET AL., ) | |
| ) | C.A. No. 17-448-MPT |
| Defendants. ) | |
| ) | |
| VANTAGE CORPORATION, ET AL., ) | |
| Counterclaim-Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| TARA SCOTT, ET AL., ) | |
| ) | |
| Counterclaim-Defendants. ) | |
| ) | |

**DEFENDANT AND COUNTERCLAIM-PLAINTIFF GERALD FINEGOLD'S
RESPONSE TO PLAINTIFFS' MOTION FOR SANCTIONS**

OF COUNSEL:

Eric C. Lang
THE LANG LEGAL GROUP LLC
2566 Shallowford Road
Suite 104 – No. 230
Atlanta, Georgia 30345
(404) 384-2591

David Hungeling
HUNGELING LAW
Peachtree 25th, Suite 599
1718 Peachtree Street, N.W.
Atlanta, Georgia 30309
(404) 574-2466

Dated: May 31, 2019

POTTER ANDERSON & CORROON LLP
Philip A. Rovner (#3215)
Jonathan A. Choa (#5319)
Hercules Plaza
P.O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com
jchoa@potteranderson.com

*Attorneys for Gerald Finegold*

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

1. Plaintiffs' Counsel Unduly Lengthened the Deposition Through Repetitive, Unnecessary, and Confusing Lines of Questions. ............................... 1

   a. Extreme Repetition of Questions ............................................................... 2

   b. Inquiry About Documents Mr. Finegold Neither Authored nor Used ............................................................................................................ 4

   c. Asking Questions About What Words Documents Did Not Contain ........ 6

2. Plaintiffs' Counsels' Experience, Especially in Relation to Mr. Finegold's Inexperience, Supports the Inference that the Interrogator Is at Fault. .................. 7

3. Though the Deposition Did Contain Difficult Moments, Large Amounts of Meaningful Testimony Were Elicited. ................................................................. 8

4. Errata Sheet Issues Are Evidentiary and not the Subject of Sanctions. ................. 9

5. Plaintiffs Would Have Incurred Nearly all of the Fees and Expenses They Seek Regardless of What Happened at the Finegold Deposition. ......................... 9

CONCLUSION ................................................................................................................... 11

## **TABLE OF AUTHORITIES**

*ADE Corporation v. KLA-Tencor Corporation,*
    C.A. No. 00-892-KAJ (MPT) (D. Del., Dec. 13, 2002) ........................................................ 10

*Boston Sci. Corp. v. Edwards Life Sciences Corp.*
    C.A. No. 16-275-SLR-SRF (D. Del., Jan. 10, 2018) ................................................................ 9

*EBC Inc. v. Clark Bldg. Sys. Inc.*,
    618 F.3d 253 (3rd Cir. 2010) ..................................................................................................... 9

# INTRODUCTION

There is no denying that the Finegold Deposition[1] was not ideal. In this motion, the experienced interrogator seeks to blame a novice witness for the outcome. Mr. Finegold respectfully submits that this Court's initial ruling, requiring him to submit to seven additional hours of disorganized, poorly framed, and repetitive questions is enough to remedy any role he may have had in the deposition's failures. Specifically, Mr. Finegold will show:

- Plaintiffs' counsel sabotaged the deposition through three types of examination failures.
- These failures stemmed from the counsel's choices, not the witness's responses.
- The deposition consisted primarily of direct question/answer dialogue, much of which was relied on in Plaintiffs' summary judgment briefing.
- Plaintiffs completely misunderstand the law and procedure surrounding errata sheets.
- Even if Plaintiffs were entitled to fees, the amount they seek is vastly excessive.

Plaintiffs are seeking to be rewarded for the missteps of their own attorney, a result counter to the letter and spirit of the Federal Rules of Civil Procedure.

# ARGUMENT

### 1. Plaintiffs' Counsel Unduly Lengthened the Deposition Through Repetitive, Unnecessary, and Confusing Lines of Questions.

Plaintiffs' counsel engaged in a number of tactics that consumed hours of time without any chance of eliciting substantive testimony. First, counsel, even when a question had been answered and confirmed, would repeat the question again and again. Second, counsel improperly pressed Mr. Finegold for testimony about documents which Mr. Finegold neither drafted nor used. Third, Mr. Finegold was asked many times about whether words not contained in exhibits

---

[1] Deposition of Defendant Gerald Finegold, (October 25, 2018 and February 1, 2019), ("Finegold Dep."), referenced pages of which are attached, in page order, as Exhibit A.

were contained in exhibits – in other words, to state that an exhibit did *not* say something. These devices put the deposition on its path to

### a. Extreme Repetition of Questions

The endless repetition of already answered questions is best exemplified through a discussion of the abbreviation "NRC," an abbreviation contained in an exhibit which Mr. Finegold did not draft, resulting in his lack of knowledge of NRC's meaning. The line of questioning began as follows:

> Q. Next line item says cost staff NRC. What does that mean? *[1]*[2]
>
> A. I don't know.
>
> Q. You have no idea what NRC means? *[2]*
>
> MS. TANNER: Objection to the form of the question.
>
> A. I don't -- I didn't produce[3] this document. I don't -- it was produced a long time ago or video if it was a video, and I don't know what was meant by that.

Finegold Dep., p. 401, l. 20, p. 402, l. 4. Thus, counsel had established and confirmed Mr. Finegold's lack of knowledge of the meaning of NRC.

Counsel had asked the question and the follow-up and received the same answer both times. Nevertheless, counsel persisted:

> Q. Sitting here today you have no idea what the term "NRC" refers to? *[3]*
>
> MS. TANNER: Objection to the form of the question.
>
> A. I would be speculating.
>
> Q. Tell me your best understanding. Have you ever heard that term before, NRC? *[4]*

---

[2] This bracketed and italicized number, which does not appear in the transcript, shows the number of times Plaintiffs' counsel repeats the identical question in exchange for the same answer.

[3] During his testimony, Mr. Finegold used the word "produce" to mean create or draft, as opposed to a document produced in response to a request for production of documents.

2

A.      I would be speculating.

Q.      Not asking you to speculate, sir. I'm just asking have you ever heard the term NRC used before? *[5]*

A.      I don't recall in the normal course of my life someone saying to me NRC and having any specific meaning.

Q.      So sitting here today in your capacity as the former president of Vantage Corporation, you have no idea what the term "NRC" means? *[6]*

MS. TANNER: Objection to the form of the question, mischaracterizes his testimony.

A.      As I've stated multiple times, I didn't produce this document, I don't know what is included in that nomenclature what they meant by it, so I really would be speculating beyond that.

Q.      Going to try one more time.[4] Sir, sitting here today, do you have any idea what the term "NRC" means in the context of the operations of Vantage Corporation? *[7]*

MS. TANNER: Objection to the form of the question.

A.      Sitting here today I have no -- I cannot say what was meant by that line item.

Q.      Not asking what was meant by that line item. Just put the document aside. I'm just asking you based upon your knowledge as the president of Vantage Corporation, do you have any idea what the term "NRC" means in the context of the operations of Vantage Corporation? *[8]*

\* \* \*

A.      NRC has no meaning in the context of the operations of Vantage Corporation.

Finegold Dep., p. 402, l. 4 – p. 404, l. 10.

Thereafter, each time the abbreviation appeared in the exhibit, Plaintiffs' counsel took the opportunity to lengthen the deposition by asking the identical question:

Q.      And you have no idea what the term "NRC" means? *[9]*

MS. TANNER: Objection to the form.

A.      I don't know what they mean here.

3

Finegold Dep., p. 410, l. 14-17.

> Q. Next line item says cost broker-dealer NRC. What is your understanding as to what that means? *[10]*
>
> A. I don't know. I didn't produce this document. I don't know.

Finegold Dep., p. 412, l. 16-20.

> Q. How about the next line item, it says cost hedge fund NRC, what does that mean to you in your capacity as the former president of Vantage Corporation? *[11]*
>
> * * *
>
> A. I didn't produce this document, so I can't say for certain what was meant by hedge fund NRC.

Finegold Dep., p.414, 1. 14 – p. 415, l. 6.

> Q. And you have no idea what NRC means? *[12]*
>
> MS. TANNER: Objection to the form of the question.
>
> A. I don't know what they mean here when they say that.

Finegold Dep., p. 417, 15-19. Mr. Finegold suggests that when a lawyer asks the same question *twelve times*, the witness should not pay a penalty.

### b. Inquiry About Documents Mr. Finegold Neither Authored nor Used

The second tactic was to attempt to get Mr. Finegold to speculate about documents he did not author or otherwise create. Repeatedly, even though Mr. Finegold testified he had no knowledge about a document, Plaintiffs' counsel pressed for testimony in countless instances:

> (ANSWERING) First, I didn't produce this document. Second, so I'm going to speculate on what you want -- you want me to speculate on what this document means?
>
> Q. Yes, sir.
>
> MS. TANNER: If you don't know the answer, then you are speculating.
>
> A. I didn't produce this document.

---

[4] Unsurprisingly, counsel tried more than "one more time."

Finegold Dep., p. 200, l. 9-15

> Q. Does that indicate to you this is on a cash basis?
>
> A. I would guess. I didn't produce this document. It says this was a document that was produced by Herb Miller. And it was produced with the focus -- the intent of it was to make it easy for the SEC to understand what the use funds were.

Finegold Dep., p. 229, l. 22- p. 230, l. 3.

> Q. There's a line item that says, VAM Business Development Outside –
>
> A. I want to say -- I want to correct that. I don't know -- this is listing use of funds. I can't really -- I didn't produce this document, so I think you are mischaracterizing what it says and I can just say it says that on the document. That's what I'm going to say.

Finegold Dep., p. 232. l. 2-9. *See also* Finegold Dep. p. 305, l. 18-21 ("I can't tell you if that exact number is correct or not. I didn't produce this document. This is a document that's produced by Herb Miller"); p. 343, l. 13-15 ("I didn't see this, as I have said over and over again. So you keep asking if I did and I didn't."); p. 349, l. 12-15 ("I just told you over, and over, and over again, I didn't see this. I never seen this document before in my life except for today. You put it in front of me"); p. 352, l. 22-24 ("I didn't draft this document, so I would need to read it to become familiar with it. It's not my document"); p. 353, l. 10-14 ("Again, I don't know what was done with this document. I didn't draft this document. . . Beyond that, I can't tell you because it wasn't my document").

This pattern peaked when Exhibit 13 was discussed, starting on page 370. Plaintiffs' counsel railed against Mr. Finegold, insisting on testimony about the preparation of a document. Mr. Finegold responded, "I didn't prepare them, so I don't know who all was involved in preparing them." Counsel sought to pick a fight with the next question, but failed:

> Q. You have no idea, sitting here today, who prepared these documents?
>
> MS. TANNER: Objection, mischaracterizes his statement.

      A.      I said I don't know who all prepared these documents.

Finegold Dep., p. 370, l. 12-17. Yet, a few questions later, counsel again pushed the issue, only to again learn what he already knew: "I didn't produce this document, so you're asking me to give you information about a document I didn't produce." Finegold Dep., p. 373, l. 5-7.

Counsel then tried to force Mr. Finegold to explain how a document (that he did not write) was used. Mr. Finegold had to explain, over and over, that "I wasn't involved in doing it, so -- and I wasn't involved in the meetings, so I don't know whether he used this or not with each person or not" Finegold Dep. p. 373, l. 14-18. *See also* Finegold Dep. p. 376, l. 8-10 ("I think you're asking me to speculate because I wasn't -- I didn't meet with the investors"); p. 377, l. 22-24 ("I didn't produce this, and I didn't meet with the investors to present this material to them."). The inevitable result was a battered witness, cornered and pushing back:

> Q      Sir, my question is: In your capacity as president of Vantage Corporation, what is your understanding as to what this document means when it says current funding level year 1?
>
> MS. TANNER: Objection to the form of the question.
>
> A. You're asking me to speculate about what somebody else's document was, Mr. Polk, and I don't know what they -- what they were meaning by that. I didn't produce this, I did not present this, I did not produce the audio that goes to this, I did not use this, I did not create this. So when you're asking what was my understanding of it, I would be speculating because that's not my document.

Finegold Dep., Page 382, l. 7-20.

        **c.**      **Asking Questions About What Words Documents Did Not Contain**

Third, Plaintiffs' counsel asked countless questions about information that was not contained in the documents referenced in the question. The questions would follow the form of "can you show me where in this recipe book I would find instructions on how to fly a plane." As was pointed out to Plaintiffs' counsel over and over, the contents of a document speak for

6

themselves, and no testimony is needed to establish words that are not in the document. Because these questions were unanswerable, they were repeated constantly. Nonetheless, the questions kept coming. Examples include:

- "What I'm asking you is can you show me anywhere in Plaintiffs' Exhibit 70 where Mr. Dwyer makes a representation that he, in fact, is an accredited investor?" (Finegold Dep., p. 166, l. 22-25)

- "Can you show me anywhere in Plaintiffs' Exhibit 70 where Mr. Dwyer acknowledges that he is, in fact, an accredited investor?" (Finegold Dep., p. 167, l. 9-11)

- "One more time. Is there any disclosure on this document anywhere in these line items that there would be a payment." (Finegold Dep. p. 429, l. 15-17.)

- "Then can you show me in this document where that disclosure is found?" (Finegold Dep., p. 434, l. 22-23)

- "So sitting here today do you see any disclosure anywhere in this document that Vantage Corporation might make payments to you . . .." (Finegold Dep., p. 448, l. 20-22.)

- "Let's go about it this way, do you see the phrase "accredited investor" anywhere in the stock subscription agreement?" (Finegold Dep., p. 535, l. 3-5.)

- "I'm going to try one more time. Can you point to me the language in the term sheet that's marked as part of Plaintiff's Exhibit 14 where there's a disclosure . . .." (Finegold Dep., p. 630, l. 2-5)

- "Do you see any disclosure anywhere in this document to the SEC where there is disclosure of the fact that moneys were being paid . . .." (Finegold Dep., p. 633, l. 2-4.)

Not surprisingly, counsel objected that a document speaks for itself approximately thirteen times[5] during the deposition.

### 2. Plaintiffs' Counsels' Experience, Especially in Relation to Mr. Finegold's Inexperience, Supports the Inference that the Interrogator Is at Fault.

Though it seems unusual to promote opposing counsel's experience, doing so demonstrates that Plaintiffs' counsel is a skilled practitioner with decades of witness

7

examinations under his belt.[6] He has practiced for approximately 30 years, is licensed to practice in three states, and is admitted to the bar of ten trial and appellate courts. He has litigated or arbitrated in excess of 200 different disputes in the financial services area alone. Mr. Finegold had only been deposed twice in his life, and one of those was as a non-party witness. Finegold Dep., p. 28, l.2-1.10.

With so much of the deposition taken up by the tactics described above, it is no wonder Mr. Finegold was very careful, and that his care could be characterized -- though incorrectly -- as uncooperativeness. Mr. Finegold's manner must also be seen against the "real world" backdrop: Plaintiffs' counsel's scorched earth tactics had already forced Vantage into bankruptcy as part of a deliberate effort to extort a payment for his clients, as Plaintiff Carter explicitly admitted:

> All – I am told the SEC has completed their investigation and notified Vantage they are dropping their inquiries and the case. I need some sort of signal or opinion that the course of action has merit . . .. *The strategy was to file these complaints to force a settlement* . . . I don't foresee this outcome . . ..

Summary Judgment App'x Ex. 40, Scott_Carter_010134.[7]

### 3. Though the Deposition Did Contain Difficult Moments, Large Amounts of Meaningful Testimony Were Elicited.

On the one hand, Plaintiffs contend that the Finegold deposition was a waste of time. On the other, Plaintiffs contend that the testimony elicited during the Finegold deposition not only prevents Defendants from receiving summary judgment, but that they are entitled to summary

---

[5] This figured is based on search results for the phrase "document speaks for itself" showing as follows for the first volume [Find (1/4) document speaks for itself] and for the second volume [Find (1/9) document speaks for itself].

[6] All information in this paragraph can be found at https://us.eversheds-sutherland.com/People/S-Lawrence-Polk and the links found on that page.

[7] Counsel began the deposition with the standard instruction to the witness: "If at any time I ask you a question that you do not understand, or if you would like for me to rephrase the question, please let me know and I'll be glad to do that for you." Finegold Dep., p. 14, l. 7-11. Counsel's questions established the need for further explanation. Ironically, Plaintiffs now seek to use Mr. Finegold's following of their lawyer's instruction against Mr. Finegold.

8

judgment on certain issues. When they moved for summary judgment, Plaintiffs found "support" in at least 35 places in the Finegold Deposition. In opposing Defendants' motions, Plaintiffs cited (in two briefs) to over 20 items. Finally, in their reply brief, Plaintiff made reference to approximately 17 portions of Mr. Finegold's testimony.

    **4.    Errata Sheet Issues Are Evidentiary and not the Subject of Sanctions.**

When a witness makes changes to testimony though the use of an errata sheet, it exposes the witness to cross examination at trial, and the changes can be used to attack the witness's credibility. Exposure to attack, and not sanctions, presents the check on any asserted misuse of the errata sheet process. The Third Circuit addressed this precise issue in *EBC Inc. v. Clark Bldg. Sys. Inc.*, 618 F.3d 253, 268 (footnote omitted) (3rd Cir., 2010), when it aligned itself (except as concerning summary judgment, not at issue here) with those courts that "have determined that the rule places no limitation on changes. Therefore, according to these courts, substantive changes must be permitted, even if they contradict the original answers or the reasons for making the changes are unpersuasive." As explained by Magistrate Judge Fallon this is the "majority rule . .. 'Under this broader interpretation of the rule, all of the deponent's answers, including old and new, remain a part of the record, and Defendants are free to cross-examine the witness at trial on his contradictory answers.'" *Boston Sci. Corp. v. Edwards Life Sciences Corp.* C.A. No. 16-275-SLR-SRF, at ¶ 31 (D. Del. Jan. 10, 2018).

    **5.    Plaintiffs Would Have Incurred Nearly all of the Fees and Expenses They Seek Regardless of What Happened at the Finegold Deposition.**

Though Mr. Finegold believes that there should be no monetary award whatsoever, it is important to note that the amounts sought by Plaintiffs are well in excess of costs arising from an additional seven hours of deposition. Plaintiffs seek all costs and fees to prepare for both deposition dates; attendance for two lawyers on one day and one lawyer on the other; and

regular, expedited and draft transcript fees. With the exception of the attendance of one lawyer at the second deposition, and the regular transcript fee for that second deposition, these expenses would have been incurred regardless of what occurred at the first deposition and therefore are not recoverable.   This court's Memorandum Order in *ADE Corporation v. KLA-Tencor Corporation,* C.A. No. 00-892-KAJ (MPT) (D. Del. Dec. 13, 2002) is instructive: the party seeking payment was limited to the initial deposition, and not the second one. *Id.* ("The expenses being sought are for the first deposition day.").

## CONCLUSION

Though the Finegold Deposition will never be held out as a model for imitation, any contribution Mr. Finegold may have made to the issues presented by his deposition were dwarfed by the actions of Plaintiffs' counsel. Mr. Finegold was required to provide an extra day of testimony (which cost him an extra day of legal fees and court reporter costs) and should not have to pay any more for a problem not of his causing.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Eric C. Lang
THE LANG LEGAL GROUP LLC
2566 Shallowford Road
Suite 104 – No. 230
Atlanta, Georgia 30345
(404) 384-2591

David Hungeling
HUNGELING LAW
Peachtree 25th, Suite 599
1718 Peachtree Street, N.W.
Atlanta, Georgia 30309
(404) 574-2466

By: */s/   Philip A. Rovner*
Philip A. Rovner (#3215)
Jonathan A. Choa (#5319)
Hercules Plaza
P.O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com
jchoa@potteranderson.com

Dated:   May 31, 2019
6229842/44217

10