## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| Tara Scott, Individually, and Wilson Carter, Individually and as Trustee of The Bailey Middleton Carter 2009 Trust, The Mary Wilson Carter 2009 Trust, and The Wilson M. Carter 1998 Trust, | : : : : : | |
| Plaintiffs, | : : | |
| v. | : : | C. A. No. 17-448-MPT |
| Vantage Corporation, Vantage Advisory Management, LLC, VF(x) LP, Tradelogix, LLC, Brian Askew, and Gerald Finegold, | : : : : : | **UNDER SEAL** |
| Defendants. | : | : |
| Vantage Corporation, Brian Askew, and Gerald Finegold, | : : | |
| Counterclaim Plaintiffs, | : : | |
| v. | : : | |
| Tara Scott, Individually, and Wilson Carter, Individually and as Trustee of The Bailey Middleton Carter 2009 Trust, The Mary Wilson Carter 2009 Trust, and The Wilson M. Carter 1998 Trust, | : : : : : : | |
| Counterclaim Defendants | : | |

## MEMORANDUM

## I.    INTRODUCTION

The case at bar concerns a securities action filed on April 20, 2017, by Tara

Scott ("Scott"), in her individual capacity, and Wilson Carter ("Carter"), in his individual

capacity and as Trustee of the Bailey Middleton Carter 2009 Trust, the Mary Wilson

Carter 2009 Trust, and the Wilson M. Carter 1988 Trust (collectively, the "Trusts")

(collectively, with Scott and Carter, "plaintiffs").[1]  Plaintiffs seek various remedies,

---

[1] D.I. 1 (Complaint); D.I. 16 (First Amended Complaint ("FAC")).

pursuant to federal securities laws, state securities laws, and various common law causes of action, from Vantage Corporation, Vantage Advisory Management, LLC, VF(x) LP, Tradelogix, LLC (collectively, "Vantage" or the "Vantage entities"), Brian Askew ("Askew"), and Gerald Finegold ("Finegold") (collectively, "defendants").[2] Specifically, plaintiffs seek rescission of defendants' sale of Vantage Corporation stock to plaintiffs, as well as interest, costs, fees, and compensatory damages.[3]  Defendants answered and asserted various counterclaims.[4]  Through various motions to dismiss, a number of claims and counterclaims remain.[5]

During the course of the proceedings before this court, on May 4, 2018, the Vantage entities filed voluntary Chapter 11 petitions in the United States Bankruptcy Court for the Northern District of Georgia and are currently consolidated under a single case before that court.[6]  The Vantage entities are subject to the automatic stay associated with those proceedings.[7]

The case at bar has nonetheless continued with respect to the claims and counterclaims associated with Askew and Finegold.  Presently before the court are the parties' cross motions for summary judgment on plaintiffs' claims and defendants'

---

[2] Scott currently resides in Florida but resided in Colorado at the time of her investment in Vantage Corporation.  D.I. 16 at ¶ 1; D.I. 158 at A424, 18:24-19:20. Carter resides in Georgia.  *Id.* at ¶ 2; D.I. 158 at A6, 14:10.  Carter serves as the trustee for the Trusts.  D.I. 16 at ¶ 3. Vantage Corporation is a Delaware corporation maintaining a principal office in Alpharetta, Georgia.  *Id.* at ¶ 4.  Vantage Advisory Management, LLC, VF(X) LP, Tradelogix, LLC, are Delaware entities and subsidiaries of Vantage Corporation.  *Id.* at ¶¶ 5-7.  Askew and Finegold are residents of Georgia. *Id.* at ¶¶ 8-9; D.I. 158 at A74, 15:21-23; *id.* at A251, 13:2-5.

[3] D.I. 1; D.I. 16; *see also* D.I. 13 at 2–6 (detailing the factual background of the allegations).

[4] D.I. 26.

[5] D.I. 13 (denying and granting various motions to dismiss and granting leave to amend); D.I. 21 (denying defendants' motion to dismiss the FAC); D.I. 111 (dismissing Wilson Carter as a plaintiff in his capacity as trustee of the Bailey Middleton Carter 2009 Trust and the Mary Wilson Carter 2009 Trust); D.I. 136 (dismissing Counts IV, VI, VII, and VIII of defendants' counterclaims).

[6] *In re: Vantage Corp. and TradeVue LLC*, Case No. 18-57728 (JRS) (Bankr. N.D. Ga.).

[7] 11 U.S.C. § 362.

motion for summary judgment on their counterclaims.[8]  The following claims are currently pending in the instant litigation:  plaintiffs' Counts I–X,[9] and defendants' Counterclaims I–III, V.[10]  As the court has discussed the factual allegations of the instant litigation elsewhere in the docket,[11] it will not do so here.[12]  The court will discuss the undisputed facts (if any) in relation to the parties' specific claims in Section III below.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate if the "movant shows that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law."[13]  Once there has been adequate time for discovery, FEDERAL RULE OF CIVIL PROCEDURE 56(a) mandates judgment against the party who "fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[14]  When a party fails to make such

---

[8] D.I. 156 (briefing at D.I. 157, 194, and 207); D.I. 160 (briefing at D.I. 173, 193, and 209); D.I. 161 (briefing at D.I. 164, 192, and 209).  The parties consented to the jurisdiction of this magistrate judge for all proceedings in this case including trial, the entry of final judgment, and all post-trial proceedings.  D.I. 5.

[9] Violation of Section 12 of The 1933 Act, 15 U.S.C. § 77l, For The Sale of Unregistered and Non-Exempt Securities (Count I); Violation of O.C.G.A. § 10-5-20 For the Sale of Unregistered and Non-Exempt Securities (Count II); Violation of O.C.G.A. § 10-5-31 (Count III); Violation By All Defendants of Section 12 of The 1933 Act, 15 U.S.C. § 77l(a)(2), Because of Misrepresentations in Connection with Issue of a Security Against All Defendants (Count IV); Breach of Fiduciary Duty (Count V); Negligence (Count VI); Accounting (Count VII); Violation of §10b-5 of the 1934 Act  and Rule 10b-5 (Securities Fraud) Against All Defendants (Count VIII); Violation of O.C.G.A. § 10-5-50 et. seq. (Securities Fraud) Against All Defendants (Count IX); Common Law Fraud (Count X).  D.I. 16.

[10] Breach of Contract (Counterclaim I); Breach of Express Warranties (Counterclaim II); Breach of Implied Covenant of Good Faith and Fair Dealing (Counterclaim III); Breach of Contract by Scott (Counterclaim V).  D.I. 26.

[11] *E.g.*, D.I. 135 at 2–8.

[12] With regard to the undisputed facts in the record, the parties' briefing is largely unhelpful—neither party presents a statement of undisputed facts or clearly identifies the relevant disputes for the court.  D.I. 157 at 2–15; D.I. 164 at 2–10; D.I. 173 at 1–6. For example, plaintiffs present numerous statements attributed to Askew as fact, although the only support for these "facts" is Scott's deposition testimony.  D.I. 157 at 12.

[13] Fed. R. Civ. P. 56(a).

[14] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

a showing, "there can be no 'genuine issue as to any material fact' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."[15]  The moving party is therefore entitled to judgment as a matter of law because "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."[16]  A dispute of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[17]

## III.    DISCUSSION

### Parties' Cross-Motions for Summary Judgment on Plaintiffs' Claims

### A.    Defendants' Overarching Arguments

Before separately discussing the parties' respective claims and counterclaims, the court addresses two overarching arguments in defendants' motion for summary judgment that they contend demonstrate that they are entitled to summary judgment on all of plaintiffs' claims against them.[18]  They contend Scott's claims fail because she released those claims when Vantage Corporation helped her facilitate purchasers for some of her Vantage Corporation shares.[19]  They argue plaintiffs' claims against Finegold fail because his only liability is secondary (i.e., control person), and his status as a corporate official is not sufficient to support a claim against him.[20]

### 1.    Scott's Stock Transfer Agreements

Scott purchased Vantage Corporation stock in a series of four transactions on January 28, February 16, February 22, and March 1, 2016.[21]  By August 2016, Scott sought to liquidate her shares because she became concerned that investment returns

---

[15] *Id.* at 323.
[16] *Id.*
[17] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
[18] D.I. 161; D.I. 164 at 1.
[19] D.I. 164 at 1.
[20] *Id.*
[21] D.I. 16 at ¶¶ 23-26.

she maintains were promised to her failed to materialize.[22]  Ultimately, Vantage Corporation agreed to waive the liquidity and redemption notice provisions in the Amended and Restated Stockholders Agreement (the "Stockholders Agreement"), which enabled Scott to sell a portion of her stock to new investors for which she received $550,000.[23]  To effectuate these sales, Scott signed three Stock Transfer, Power of Attorney to Transfer Stock and Release Agreements (the "Stock Transfer Agreements"), effective as of September 29, October 7, and October 24, 2016.[24]

The Stock Transfer Agreements provide that Scott would:

> hereby release remise, acquit and forever discharge [Vantage Corporation] and each of the [Vantage Corporation's] successors, assigns, affiliates, and their respective past and present officers, directors, agents, servants, employees, and attorneys (the "Releasees"), from any and all rights, demands, claims, damages, losses, costs, expenses, actions and causes of action whatsoever, including but not limited to claims arising under the Shares, including claims in tort or in contract, at law or in equity, known or unknown, contingent or fixed, suspected or unsuspected.[25]

They also provided that she was "giving up rights, if any, which Transferor[, Scott,] may have under federal, state, or municipal law, and is hereby covenanting not to file complaints or lawsuits or to assert any claims against the Releasees arising thereunder."[26]

On December 13, 2016, after the sale of a portion of her Vantage Corporation stock, Vantage Corporation issued Scott another stock certificate for 214.633217 shares of Class A common stock.[27]  Scott is still listed as a stockholder on Vantage

---

[22] D.I. 157 at 13-14; D.I. 167, ex. 8, 88:10:69-89:6; D.I. 168, ex. 25 (e-mail from Scott to Askew (Jan. 20, 2017 6:11 p.m.)).

[23] D.I. 164 at 8; D.I. 167, ex. 8, 91:14-24; D.I. 168, exs. 17-19; D.I. 158 at A442, 91:14-20.

[24] D.I. 160 at A1394, A1395, A1396.

[25] D.I. 168, exs. 17-19.

[26] Id., exs. 17-19.

[27] D.I. 160 at A1067-A1072 (Vantage Corporation Stock Transfer Ledger) at A1069.

Corporation's official stock ledger.[28]  On December 13, 2016, Vantage Corporation issued another stock certificate to her for 214.633217 shares of Class A common stock.[29]  Vantage's 2017 tax return reports that Scott held 692 shares of Vantage stock as of December 31, 2017.[30]

Defendants argue the Stock Transfer Agreements constitute a broad waiver of the claims Scott asserts in this action.[31]  Plaintiffs assert that, at most, the parties only reasonably intended to release Scott's claims related to the shares sold pursuant to the three Stock Transfer Agreements.[32]  They additionally maintain the Stock Transfer Agreements are void because Scott was fraudulently induced to sign them.[33]

"Delaware courts recognize the validity of general releases."[34]  A valid release must be unambiguous, not unconscionable, and not against public policy.[35]  "A clear and unambiguous release 'will [only] be set aside where there is fraud, duress, coercion, or mutual mistake concerning the existence of a party's injuries.'"[36]

The court determines the Stock Transfer Agreements did not release all Scott's claims against defendants because they apply only to the Vantage Corporation stock

---

[28] *Id.* at A1067-A1072 (Vantage Corporation Stock Transfer Ledger); *id.* at A1397-A1441 (Vantage Corporation 2016 Tax Return); *id.* at A1442-A1452 (Vantage Corporation 2017 Tax Return).

[29] *Id.* at A1067-A1072 (Vantage Stock Transfer Ledger) at A1069.

[30] *Id.* at A1366-A1384 (Scott Decl.) at ¶ 11; *id.* at A1442-A1452 (Vantage 2017 Tax Return) at A1450.

[31] D.I. 164 at 11.

[32] D.I. 192 at 7; *see also* D.I. 193 at 11 (arguing a lack of mutual assent because Scott believed the Stock Transfer Agreements applied only the shares sold, not all her shares, ones being sold).

[33] D.I. 192 at 7-8; *see also* D.I. 193 at 9-10.

[34] *Deuley v. DynCorp Int'l, Inc.*, 8 A.3d 1156, 1163 (Del. 2010) (citing *Chakov v. Outboard Marine Corp.*, 429 A.2d 954, 985 (Del. 1981)).

[35] *Comvest Capital II, LP v. Selkoe*, C.A. No. N15C-08-110 JRJ CCLD, 2016 WL 1735532, at *4 n.25 (quoting *Tucker v. Albun, Inc.*, No. Civ. A. 97C-04-025, 1999 WL 1241073, at *2 (Del. Super. Sept. 27, 1999)).

[36] *Deuley*, 8 A3d at 1163 (alteration in original) (quoting *Parline v. DynCorp Int'l, Inc.*, C.A. No. 08c-01-136 FSS, 2009 WL 3636756, at *4 (Del. Super. June 2, 2009)).

sold pursuant to each transaction, not to the shares she continues to hold.[37]  Scott signed three separate releases related to three separate transactions with three separate effective dates.  Plaintiffs began its opposition to defendants' motion for summary judgment based on the Stock Transfer Agreements with this argument, and repeated it in its opposition to defendants' motion for summary judgment on their counterclaims.[38]  Defendants did not respond to this argument in their consolidated reply brief.[39]

The court denies defendants' motion for summary judgment on this issue.  In light of this determination, the court will not address the parties' other arguments.

## 2.    Finegold as Control Person

Defendants argue they are entitled to summary judgment on plaintiffs' claims against Finegold because there are no primary liability allegations against him, he is not a control person with respect to Askew and plaintiffs cannot show Finegold's culpable participation, and there is no basis for secondary liability against him under respondeat superior.[40]  Plaintiffs dispute those arguments.[41]

> The elements of controlling persons claims under Section 20 of the Exchange Act and Section 15 of the Securities Act are identical.  *See In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 940 (D.N.J.1998).  To state a claim for control person liability, the plaintiff must allege (1) a primary violation of the federal securities laws by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful way a culpable participant in the primary violation.  [*In re Reliance Securities Litigation*, 91 F. Supp. 2d 706, 731 (D.

---

[37] *See, e.g., See Artery v. Allstate Ins. Co.*, 984 P.2d 1187, 1191 (Colo. App. 1999) ("The scope of claims to be released is determined primarily by the intent of the parties as expressed in the release instrument. It is to be considered in light of the nature of the claim and the objective circumstances underlying execution of the release."), *implied overruling on other grounds recognized by Lauric v. USAA Cas. Ins. Co.*, 209 P.3d 190 (Colo. App. 2009).

[38] D.I. 192 at 7; *see also* D.I. 193 at 11.

[39] *See* D.I. 209 at 8-9 (responding to plaintiffs' mutual assent argument).

[40] D.I. 164 at 12-15.

[41] D.I. 192 at 5; *see also* D.I. 157 at 24-26, D.I. 207 at 3-5 (plaintiffs' opening and reply brief in support of their affirmative motion for partial summary judgment).

Del. 2000)] (citing *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir.1998)).[42]

Section 20(a) of the Exchange Act provides that

[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . , unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.[43]

The Third Circuit observed:

Section 20(a) thus opens the possibility of making "controlling persons jointly and severally liable with the controlled person" for violations of the Exchange Act.  *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 275 (3d Cir.2005).  "Under the plain language of the statute, plaintiffs must prove not only that one person controlled another person, but also that the 'controlled person' is liable under the [Exchange] Act."  *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 153 (3d Cir.2004) (internal quotation marks omitted), *abrogated on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).

In addition to the statutory elements of controlling person liability, we have also held that, in order for secondary liability to attach under § 20(a), the defendant "must have been a 'culpable participant' in the 'act or acts constituting the violation or cause of action.'"  *SEC v. J.W. Barclay & Co.*, 442 F.3d 834, 841 n.8 (3d Cir.2006) (citing *Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880, 889–90 (3d Cir.1975)); *see also Sharp v. Coopers & Lybrand*, 649 F.2d 175, 185 (3d Cir.1981), *overruled on other grounds by In re Data Access Sys. Sec. Litig.*, 843 F.2d 1537 (3d Cir.1988) (en banc) ("One element of any case imposing liability under § 20(a) is 'culpable participation' in the securities violation.").  Examples of such culpable participation include an executive's transfer of assets to himself so that the brokerage firm he controlled would be unable to pay a penalty to the SEC, see *J.W. Barclay & Co.*, 442 F.3d at 841 n.8, and a broker-dealer's "active participation" in a scheme to induce investors to purchase stock in an insolvent company in which the role of the broker-dealer and its sole shareholder "was not merely that of a facade for fraud but rather one of a

---

[42] *Tracinda Corp. v. DaimlerChrysler AG*, 197 F. Supp. 2d 42, 55 (D. Del. 2002) (emphasis added).

[43] 15 U.S.C. § 78t(a).

8

culpable confederate," *Straub v. Vaisman & Co., Inc.*, 540 F.2d 591, 596 (3d Cir.1976).[44]

Plaintiffs' control person liability claim under the Georgia securities claims are analyzed in the same manner as control person liability under federal law.[45]

The FAC alleges:

Upon information and belief, at the time that Askew offered for sale and sold Plaintiffs the Vantage Corporation stock, Gerald Finegold was a director of Vantage Corporation, and/or officer of Vantage Corporation, and/or a control person of Vantage Corporation and/or Askew under Section 15 of the 1933 Act, 15 U.S.C. § 77o and the Georgia Securities Act, O.C.G.A. § 10-5-58 (d)–(g).[46]

In each of plaintiffs' claims, Finegold is alleged to be "liable . . . for the acts of Askew because he participated in these acts, because of the doctrine of respondeat superior, or because he was a control person with respect to Askew."[47]  The court notes plaintiffs do not make arguments recording Finegold's liability under a respondeat superior theory.  In fact, they distinguish that principle in response to a subsidiary argument made by defendants, stating, "the only authority Defendants cite for this proposition . . . involves respondeat superior principles, and control person liability is a distinct and entirely different legal concept under federal and state securities law."[48]

---

[44] *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 484–85 (3d Cir. 2013) (footnote omitted).

[45] *See Curry v. TD Ameritrade, Inc.*, No. 1:14-CV-1361-LMM, 2015 WL 11251449, at *19 (N.D. Ga. June 30, 2015) (stating that the analysis for determining whether an individual is a control person under the GUSA is the same as under the 1933 Act and the 1934 Act) (citing *Binder v. Gordian Secs., Inc.*, 742 F. Supp. 663, 667 (N.D. Ga. 1990)).  Plaintiffs acknowledge the near identical definitions of "control person" under Federal and Georgia securities law.  D.I. 157 at 25 (citing *Binder*, 742 F. Supp. at 667).

[46] D.I. 16 at ¶ 32.

[47] *Id.* at ¶¶ 60, 78, 108 (Federal securities counts I, IV, VIII), 66, 71, 188 (Georgia securities counts II, III, IX); *see also id.* at ¶¶ 85, 92, 118 (common law tort counts V, VI, X (alleging Finegold's liability because of his "participat[ion] in these acts and/or because of the doctrine of respondeat superior")).

[48] D.I. 207 at 5 (citation omitted).

Plaintiffs state that Vantage Corporation was a small company with a handful of employees during 2016.[49]  They base their control person liability on Finegold's position as President, Vice President, and Treasurer of Vantage Corporation,[50] that he prepared materials provided to potential investors, and met with potential investors as early as 2014.[51]  They also note his duties as President included legal and accounting work in his review of internal financial statements provided to the company's outside accountants,[52] and that he signed the Form D Vantage Corporation filed with the SEC claiming exempt status for the 2016 offering.[53]

Plaintiffs' assertion that "Finegold's multiple titles are sufficient" to demonstrate his control is misplaced.[54]  "[S]tatus as an officer, director or shareholder of a corporation, absent more is not enough to trigger liability as a 'controlling person' under securities law."[55]  The court also finds Finegold's review of  Vantage Corporation's financial statements, provided to the company's accountants, does not demonstrate control for purposes of the securities laws.  Likewise, his signing of the company's Form D claiming exemption for the 2016 offering, which the court determines, below, was proper, does not demonstrate control.[56]  Moreover, that Vantage Corporation was a small company is not sufficient on the facts of this case for a trier of fact to reasonably infer Finegold's alleged control of Askew and the 2016 offering.  Plaintiffs' reliance on *In*

---

[49] D.I. 192 at 5.

[50] *Id.* (citing D.I. 158, A88 at 70:16-21).

[51] *Id.* (citing D.I. 158, A264 at 67:19-68:24; A387 at 380:19-22).

[52] *Id.* (citing D.I. 158, A255 at 31:13-32:25; A348 at 385:20-386:5; A365 at 453:3-10).

[53] *Id.* (citing D.I. 159 at A651-A655).

[54] D.I. 164 at 8 (citing O.C.G.A. § 10-5-58(g)(1-2).

[55] *Martin v. Brown*, 758 F. Supp. 313, 324 (W.D. Pa. 1990); *see also Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F. 3d 1151, 1163 (9th Cir. 1996) (holding company's chairman and CEO was not liable as a control person where there was no evidence that he was significantly involved in the offering at issue).

[56] At most, signing the Form D would demonstrate control over the drafter of the document, e.g., a law firm.

*re Phillip Petroleum Sec. Litig.*,[57] is unpersuasive.  There, the plaintiffs alleged that each individual was a culpable participant in the unlawful activity.[58]  The alleged fraud also included the dissemination of what the court found to be false and misleading information in a federal filing.[59]  Here, plaintiffs do not allege a primary violation by Finegold, only secondary liability, the court finds, below, the Vantage Corporation stock was properly claimed as exempt from registration and, as defendants note, the Form D in this case is merely another document identifying Finegold's title.[60]

Lastly, the evidence does not show Finegold's culpable participation in the purported fraud of the allegedly controlled person, Askew, in connection to the allegedly fraudulent 2016 Vantage Corporation stock offering, which requires a "knowing and substantial participation in the wrongdoing."[61]

Plaintiffs state, without record citation, that "Finegold was responsible for vetting Vantage investors."[62]  They also allege Finegold met with potential investors as early as 2014.[63]  Finegold's cited testimony does not link any purported meetings to the disputed stock issuance.  He testified his responsibilities as president of Vantage Corporation was generally to help the company succeed by expanding the business to monetize the software technology.[64]  He stated he met with some individuals thought to have interest in investing in the company in early 2014,[65] and worked on documentation in the end of 2014 and 2015 that potential investors might ultimately be able to review,[66] but plaintiffs do not submit evidence Finegold met with Scott, Carter, or other potential investors in

---

[57] 738 F. Supp. 825, 841 (D. Del. 1990).

[58] *Id.*

[59] *Id.*

[60] D.I. 29 at 7-8.

[61] *See VT Inv'rs v. R & D Funding Corp.*, 733 F. Supp. 823, 841 (D.N.J. 1990) (citing *Gould v. American–Hawaiian Steamship Co.*, 535 F. 2d 761, 779 (3d Cir. 1976).

[62] D.I. 192 at 9.

[63] D.I. 207 at 3.

[64] D.I. 158, A267 at 67:19-68:2.

[65] *Id.*, A267 at 68:3-24.

[66] *Id.*, A397 at 580:19-22.

the 2016 offering, or that the document he referenced working on was reviewed by those individuals.

Other record evidence relied on by plaintiffs, e.g., Finegold signing Stock Subscription Agreements, authoring shareholder letters to Vantage Corporation investors, and/or being introduced to Matthew Dwyer ("Dwyer") and John Carr ("Carr") and raising issues concerning their compensation (which, with regard to Dwyer, Finegold sought legal advice),[67] do not show either Finegold's control of, or culpable participation in, any fraud alleged connected to the 2016 stock offering.

The court denies plaintiffs' motion for summary judgment on the control person issue and grants defendants' motion.

### B.    Plaintiffs' Count I (Violation of Section 12 of the 1933 Act, 15 U.S.C. § 77l, For the Sale of Unregistered and Non-Exempt Securities)

Plaintiffs allege that Askew violated Section 12(a)(1) of the Securities Act of 1933[68] (the "1933 Act") and is "liable to Carter because Askew offered and sold stock of Vantage Corporation to Plaintiffs when that stock was neither subject to an effective registration statement pursuant to section 5 of the 1933 Act, 15 U.S.C. § 77e, nor exempt from registration."[69]  "Specifically, on or about March 11, 2016, Carter purchased 476.962702 Class A shares in Vantage Corporation for $1,000,000."[70]  It is undisputed "that the securities sold by Vantage Corporation were not registered under the Securities Act of 1933 or any state securities laws."[71]  There are opposed cross motions for summary judgment as to these claims.[72]

---

[67] D.I. 207 at 4.
[68] 15 U.S.C. § 77l(a)(1).
[69] D.I. 16 at ¶ 54.
[70] *Id.* at ¶ 55.
[71] D.I. 162 at A1547 (defendants' response to plaintiffs' first requests for admission); *see also* D.I. 159 at A651–A655 (Vantage Corp. Form D filing); D.I. 196-1, ex. 67.
[72] D.I. 156; D.I. 161; *see also* D.I. 157; D.I. 164; D.I. 192; D.I. 194; D.I. 207; D.I. 209.

### 1.    The parties' motions

Plaintiffs move for summary judgment as to Askew and argue that Askew sold unregistered Vantage securities and that those securities do not qualify for the Rule 506(b)[73] exemption for a host of reasons.[74]  Defendants present facts in a different context and argue that summary judgment is appropriate, because there are no disputed facts related to the exemption under Regulation D.[75]

The record before the court is deficient in that plaintiffs broadly attribute alleged conduct to "Vantage" without clearly identifying the specific conduct related to the claims in the First Amended Complaint.  For example, the gravamen of plaintiffs' Counts I–III relate specifically to the sale of approximately $8 million in unregistered Class A common stock in Vantage Corporation between January and March 2016.[76]  However, much of plaintiffs' briefing on summary judgment discusses the conduct of Askew, Dwyer, and Carr from the summer of 2016 and related to the sale of limited partnership interests in a hedge fund, named VF(X) LP (the "hedge fund").[77]  Even though an LLC primarily owned by Vantage Corporation was to be the general partner of the hedge fund,[78] and thus individuals involved with Vantage Corporation and its subsidiaries were involved, it is undisputed that the alleged conduct occurred *after* Vantage Corporation

---

[73] 17 C.F.R. § 230.506(b).

[74] D.I. 157 at 16–23.

[75] D.I. 164 at 16–20.

[76] D.I. 158 at A191, 468:19-24 (Askew deposition); *id.* at A281, 134:11–13 ("Vantage wasn't offering any stock in the summer of 2016"); *id.* at A282, 141 (explaining that Vantage Corporation raised $8 million in this funding round); *see generally* D.I. 171, ex. 54 (documenting signed stock subscription agreements for funds raised by Vantage Corporation).

[77] *See, e.g.*, D.I. 162 at A1088–1143 (May 2016 Confidential Private Offering Memorandum in VF(X) LP); *id.* at 1144–48 (Form D related to this offering).

[78] That is Vantage Advisory Management LLC ("VAM"), in which Vantage Corporation held a 97% ownership interest, with Matthew Dwyer and Connect Capital, Inc. each owning 1.5%.  *E.g.*, D.I. 175-1, ex. 59 at 3–5.

closed its securities offering.[79]  With the focus on the securities offered by Vantage Corporation, the court turns to the parties' motions.

### (a)    Plaintiffs

Plaintiffs argue that the Vantage Corporation securities do not qualify for the registration exemption under Rule 506(b), because:  (1) Vantage sold to unsophisticated and unaccredited investors, (a) Dwyer "who was in personal bankruptcy at the time," and (b) "Mary Wilson Carter, [who was] a thirteen year old child at the time of her purchase[;]"[80] (2) "Vantage sold to unaccredited investors without making requisite disclosures to these individuals[,]" namely these same two individuals;[81] (3) "Vantage and its agents engaged in a general solicitation of investors with whom the company had no pre-existing relationship[;]"[82] (4) "[d]efendants bear the burden of proving the private offering exemption was 'met not only with respect to each purchaser, but also with respect to each offeree' by providing detailed information about 'the number of offerees, the relationship of the offerees to each other and the issuer, the manner of the offering (that is, solicitation), information disclosure or access, and the sophistication of the offerees[]'" but that defendants cannot meet this burden;[83] (5) Dwyer "is a 'bad actor' under Rule 506(d) whose background was never disclosed in writing . . . to potential investors prior to purchase[.]"[84]

---

[79] *Compare* D.I. 157 at 9 (citations omitted) (alleging that "Vantage securities were offered indiscriminately to persons who crossed paths with Askew or Dwyer.  For example, in 2016, Askew and Dwyer approached two women at a bar in Aspen Colorado, solicited them to buy Vantage stock, and spent over $900 in investor funds wining and dining them."), *with* D.I. 159 at A607, 245:2–A610, 256:12 (discussing Dwyer's "trip to Aspen in July of 2016," the meeting at the Hotel Jerome bar, and Scott's e-mail the same day dated "July 21, 2016").

[80] D.I. 157 at 18.

[81] *Id.*

[82] *Id.* at 19 (citing *Johnston v. Bumba,* 764 F. Supp. 1263, 1274-75 (N.D. Ill. 1991); *Sec. & Exch. Comm'n v. Cont'l Tobacco Co. of S.C.*, 463 F.2d 137, 161 (5th Cir. 1972)).

[83] *Id.* at 19 (quoting *SEC v. StratoComm Corp.,* 2 F. Supp. 3d 240, 264 (N.D.N.Y. 2014).

[84] *Id.* at 20.

### (b)    Defendants

Defendants move for summary judgment and argue in opposition to plaintiffs' stated rationales.  For example, defendants argue that:  (a) they "reasonably believed that all purchasers of Vantage stock were accredited[;]" (b) "[e]ach investor was given a packet of subscription documents prior to their purchase which made clear that the offering was available only to accredited investors[;]" (c) the Vantage Corporation offering "was a private offering[;]" and (d) "prior to January 2016 the investors were . . . Mr. Finegold and other members of [his] family."[85]

### 2.    Analysis

Based upon these arguments, the court addresses the accreditation of investors, whether the Vantage Corporation was a private offering, and plaintiffs' "bad actor" assertions.[86]

### (a)    Accreditation of investors

It is apparent from the record that Vantage Corporation sold its stock to a number of accredited investors, including Scott,[87] Carter,[88] and Carter's older daughter, Bailey.[89] Defendants argue that they ascertained whether investors were accredited based on facts known about investors as well as representations the investors made in

---

[85] D.I. 164 at 16–17 (citations and footnotes omitted).

[86] Given that plaintiffs' memorandum of law was filed at the same time as defendants' cross motion, plaintiffs' argument that defendants have not met their burden is largely speculative.  Although defendants have the burden to demonstrate that the registration exemptions apply, *Sec. & Exch. Comm'n v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953), plaintiffs put the cart before the horse here by arguing this ground for summary judgment without any argument (or evidence) by defendants in the record.  By their reply brief, plaintiffs essentially argue that defendants have the burden to disprove any negative inferences from the entirety of Rule 506(b) that plaintiffs can think of, and plaintiffs are more than happy to oblige with a laundry list of possible arguments.  D.I. 207 at 5–6.  However, since defendants have addressed each of plaintiffs shifting arguments on the merits, including identifying relevant evidence in support of their claim to exemption, the court declines to separately address this aspect of plaintiffs' briefing.

[87] D.I. 158 at A437, 70:10–20 (Scott, discussing her net worth as of January 2016).

[88] *Id.* at A6, 16:19–24; A30, 112:22–113:4.

[89] *Id.* at A30, 113:5–7.

the documents they signed.[90]  For example, prospective Vantage Corporation investors were presented with the following documents:[91]  Term Sheet,[92] Stockholder Agreement,[93] Stock Subscription Agreement,[94] and Joinder Agreement.[95]  The Term Sheet clearly states that the document "outlines the terms and conditions of a proposed offering by Vantage Corporation of shares of its class A common stock to accredited investors" and that

> The Shares are being offered only to accredited investors as defined under the Securities and Exchange Commission's Regulation D issued under the Securities Act of 1933, as amended, and the related rules and regulations, who are qualified to be shareholders in a corporation that has elected to be taxed under Subchapter S of the Internal Revenue Code of 1986, as amended (each, an "Investor").[96]

The document also states that it "is an expression of the intent of the parties and is not to be construed as a binding agreement except for the 'Confidentiality' provisions[.]"[97] The Term Sheet states that "[t]he Investors' investment will be effective through definitive subscription agreements reflecting the terms [] to be executed by the parties."[98]

---

[90] D.I. 194 at 3; D.I. 175-1, ex. 59 at 6 ("Investors Knew they were Buying Unregistered Shares and Represented that they were Accredited"); D.I. 167, ex. 3 at 189:9–17 (Scott "told us she was [accredited].  She signed the agreements.  The agreements specifically say that you were relying on the fact that she was accredited. She spoke of buying planes.  She lived in Aspen.  It was pretty obvious to us that she was accredited.").

[91] *E.g.*, D.I. 195 at B1.

[92] D.I. 167, ex. 10.

[93] *Id.*, ex. 11.

[94] D.I. 168, ex. 41 at 7–10.

[95] *Id.* at 12.

[96] D.I. 167, ex. 10 at 1.

[97] *Id.* at 4.

[98] *Id.*

Plaintiffs signed the Stock Subscription Agreement[99] and the Joinder Agreement.[100]  In the Stock Subscription Agreement, the purchaser "represents and warrants" that:

> (i) either alone or with the assistance of the undersigned's professional advisors, has such knowledge and experience in financial and business matters that the undersigned is capable of evaluating the merits and risks of the undersigned's purchase of the Shares;
>
> (ii) has sufficient financial resources to be able to bear the risk of the undersigned's investment in the Shares;
>
> (iii) understands that the Company has accepted the transfer of the assets of Trade Vue LLC, a Delaware limited liability company *("TradeVue"),* at fair market value, and even though the purchase price was at fair market value, it is possible the transaction may be challenged by current or future creditors of Trade Vue and /or Brian Askew, the sole member of Trade Vue;
>
> (iv) is an individual (other than a nonresident alien), a "grantor trust," "qualified subchapter S trust" or "electing small business trust", each as defined in the applicable provisions of the Internal Revenue Code of 1986, as amended.[101]

In addition, the Stock Subscription Agreement includes language that the shares are unregistered (and carry specific requirements on sale and/or transfer) and that stock certificates will be marked with specific language identifying the unregistered nature of the shares.[102]

---

[99] D.I. 168, exs. 13–15 (Scott); *id.*, ex. 28 (Carter); *id.*, ex. 32 (Carter on behalf of the Wilson M. Carter 1988 Trust); *see also id.*, ex. 29–30 (Bailey M. Carter and Mary Wilson Carter).

[100] D.I. 168, ex. 16 (Scott); *id.*, ex. 27 (Carter); *id.*, ex. 31 (Carter on behalf of the Wilson M. Carter 1988 Trust); *see also* D.I. 158 at A29 107:20–108:13 (Bailey M Carter and Mary W Carter); D.I. 175-1, ex. 59 at Colby_000036 (Ansley Colby).

[101] D.I. 168, ex. 41 at 7.

[102] *Id.* at 7–8.

The Joinder Agreement makes signatories parties to the Stockholders Agreement.[103]  In the Stockholders Agreement, "[e]ach Investor severally (but not jointly) represents and warrants to the Company, Finegold, Askew and each other Investor that: . . . the Investor is legally competent to enter into this Agreement and to undertake the transactions contemplated in this Agreement without the consent of any other Person."[104]

With the benefit of discovery, and hindsight, plaintiffs argue that the Regulation D exemption does not apply to the sale of Vantage Corporation stock, because Vantage Corporation sold stock to Mary Wilson Carter and Dwyer, who plaintiffs contend were not accredited in early 2016.[105]  For example, Carter's younger daughter, Mary Wilson Carter, purchased $500,000 of Vantage Corporation stock in February, 2016,[106] but Carter claims that she was not an accredited investor, because "[s]he does not have assets in her name, nor a residence in her name, and she was 13 years old at the time."[107]  As to Dwyer, plaintiffs allege that he was not accredited on January 1, 2016, when he purchased $50,000 in Vantage Corporation stock, because he was in Chapter 7 bankruptcy at the time and had to borrow the money for the investment.[108]

### (i)    Mary Wilson Carter

The facts relating to Mary Wilson Carter are worth noting.  On February 29, 2016, Carter had decided to invest $1,000,000 in Vantage Corporation.  Carter told Askew that he wished to make part of the investment through an LLC in which his daughters

---

[103] D.I. 168, ex. 16 ("By the undersigned's signature below, the undersigned is becoming a party to that certain Stockholders Agreement ('Agreement') made and entered into as of January 1, 2016, by and among Vantage Corporation, a Delaware corporation (the 'Company'), Gerald Finegold, an individual ('GF') and each of the other Investors listed on the signature pages thereto.").

[104] D.I. 168, ex. 41 at 17, § 2.4(b).

[105] D.I. 157 at 18–19.

[106] D.I. 171 at 75 of 214–78 of 214.

[107] D.I. 158 at A30, 113:8–16.

[108] D.I. 157 at 8.

were members—Askew informed him that, "[t]he funds can come from the entity but Vantage can[']t title in an LLC.  It has to be an individual or a trust.  We could easily title In each girl[']s name.  Would you like that?"[109]  Carter informed Askew to title the share in the names of his two daughters.[110]  Carter revealed in his deposition that his daughters were not actually members of the LLC from which the funds were drawn and, in fact, the members of the LLC were two trusts for the benefit of his daughters.[111] Nonetheless, Carter presented his minor daughter with the relevant documents, had her sign them in his presence, and returned the documents to Vantage Corporation.[112] These documents represented Mary's capacity.[113]  At the time, Carter did not tell Askew, or anyone else at Vantage, that Mary Wilson Carter was a minor.[114]

Having behaved in this manner, Carter and Scott now argue that Mary Wilson Carter's minor status invalidates the entire Vantage Corporation offering.  This argument fails to address the facts that:  (1) Carter was an accredited investor at the time; (2) he had a background in the securities industry, including holding a Series 7 license; (3) that he knew his daughter was a minor and still had her sign the documents; and (4) those documents represented that his minor daughter, in fact, had the capacity to purchase stock only available to accredited investors.[115]  In light of Carter's active involvement in the transaction involving Mary Wilson Carter, the court rejects plaintiffs arguments as to Mary Wilson Carter's incapacity.[116]  Meanwhile plaintiffs have not

---

[109] D.I. 195 at B3.

[110] D.I. 168, ex. 36 at 12–13.

[111] D.I. 158 at A17, 61:5–A18, 64-7.

[112] *Id.* at A27, 101:13–A28, 102:4.

[113] *Id.*, ex. 41 at 17, § 2.4(b) (Stockholders Agreement).

[114] *Id.* at A27, 101:1–5. In hindsight, Carter takes the position that "the question should have come from Mr. Askew as to her accredited investor status." *Id.* at A21, 74:7–11.

[115] D.I. 164 at 5.

[116] *E.g.*, *Wright v. Nat'l Warranty Co.*, 953 F.2d 256, 260 (6th Cir. 1992) (rejecting the argument that the exemption does not apply because one of the investors, after representing that she was accredited, claimed that her lack of accredited status rendered the exemption invalid).  The court does not reach the argument that Ms.

identified any issues of material fact that would call into question that, based upon Carter's accredited status and experience in the securities industry, defendants reasonably believed[117] that Mary Wilson Carter was accredited at the time.[118]

### (ii)    Dwyer

In this light, the court turns to Dwyer.  Plaintiffs present documentary evidence that Dwyer filed for personal bankruptcy in September 2013 and did not exit Chapter 7 until July 2016.[119]  Plaintiffs also document Dwyer's income for 2013–15 and argue that he could not qualify as accredited under the income rules.[120]  In addition, plaintiffs demonstrate that Dwyer borrowed the $50,000 he invested in Vantage Corporation.[121]  These facts are undisputed and generally lead to the inference that Dwyer was not accredited on January 1, 2016.  In other words, plaintiffs contend that Dwyer was unaccredited when he invested in Vantage Corporation.

Defendants argue that they "were entitled to reasonably rely and did rely on [] Dwyer's acknowledgements in the subscription documents that he was an accredited and/or sophisticated investor."[122]  In fact, defendants contend, "Dwyer testified that, at the time of his purchase, he was in fact an accredited investor" based upon his "ownership in companies at the time."[123]

---

Carter is otherwise represented by her father (as her purchaser's representative) and is a "sophisticated investor" under Rule 502(b)(2)(ii).  D.I. 164 at 19–20. Defendants do not discuss whether the disclosure requirement of 17 C.F.R. § 230.502(b)(2) applies. *Id.*  Plaintiffs did not respond to this argument. D.I. 192 at 10–15.

[117] D.I. 158 at A159, 356:6–358:22; D.I. 167, ex. 6 173:14-22, 176:16-21.

[118] 17 C.F.R. § 230.501(a) ("Accredited investor shall mean any person who comes within any of the following categories, or who the issuer reasonably believes comes within any of the following categories[.]").  For example, plaintiffs have not identified any evidence in the record that demonstrates that Vantage Corporation, Askew, or Finegold even knew that Mary Wilson Carter was a minor at the time.

[119] D.I. 159 at A918–66.

[120] D.I. 157 at 8.

[121] *Id.*

[122] D.I. 164 at 20 n.12.

[123] *Id.* (citations omitted).

Plaintiffs reply that defendants "cannot prove they believed all investors were accredited under the[ offering] documents, as they do not identify *any* language from *any* agreement signed by *any* investor in which that investor affirmatively represents that they are accredited."[124]  In other words, plaintiffs assert that defendants must prove their belief that Dwyer was accredited by pointing to specific contractual language in a signed offering document.[125]  Defendants disagree with this standard and point to the instructions of Rule 506(b), which state that "[t]he issuer is not required to use any of the[] methods [discussed in the rule] in verifying the accredited investor status of natural persons who are purchasers."[126]  In support, defendants underline the representations in the offering documents that support their belief that Dwyer and others were accredited.[127]

The undisputed facts in the record are that Dwyer:  (1) had experience in the securities industry[128] and knew that an accredited investor was "[a] sophisticated individual that understands risks[;]"[129] (2) signed the offering materials;[130] and (3) testified that he was, in fact, accredited in January 2016.[131]  Also, Askew and Finegold testified that in 2016 they believed that the disclosures they made to potential investors

---

[124] D.I. 207 at 6 (emphasis in original); *see also* D.I. 192 at 12–13.

[125] *E.g.*, D.I. 192 at 11 ("The undisputed facts show that the term 'accredited investor' appears nowhere in any of the Vantage documents signed by investors, Defendants did not explain to investors what 'accredited' means, and Defendants did not understand the term themselves.").  Of course, this is an attempt to avoid a factual dispute by parsing the offering documents into those signed by investors and those (i.e., the Term Sheet, which contains extensive "accredited investor" language) provided to investors but not necessarily signed by them.

[126] 17 C.F.R. § 230.506(c)(2)(ii) (Instruction 1); *see* D.I. 209 at 5.

[127] D.I. 164 at 4–5.

[128] D.I. 159 at A867–A891 (FINRA BrokerCheck Report documenting Dwyer's securities-industry experience as well as his permanent bar from association with any FINRA member firm); *see also id.* at A863 ("It is ordered that [Dwyer] be barred from association with any FINRA member firm in any capacity").

[129] D.I. 159 at A559, 51:4–7.

[130] *E.g.*, D.I. 171, ex. 54 at 40 of 214–42 of 214.

[131] D.I. 167 at 77:20–78:13.

accompanied by the offering materials were sufficient to establish whether those investors were accredited.

Plaintiffs do not identify any issues of material fact that would preclude judgment as a matter of law—instead, plaintiffs maintain that under the facts argued, the *only way* defendants can demonstrate their reasonable belief as to Dwyer's accreditation is for Dwyer to have affirmed or warranted that he was accredited.[132]  While the court agrees that such an affirmation would simplify the motion presently before it, the court notes that requiring such an evidentiary standard would present an unreasonable burden of proof.  Circumstantial evidence of compliance with Regulation D should be sufficient, and even the case cited by plaintiffs, *Hamby v. Clearwater Consulting Concepts, LLLP*,[133] discusses the possibility that defendants could have offered "affidavits or deposition testimony that the other investors were accredited investors under Regulation D."[134]  Such circumstantial evidence is present, and undisputed, in the case at bar.  For example, in addition to their own testimony of their beliefs related to the offering documents, defendants have provided deposition testimony that plaintiffs and the parties associated with them were accredited investors in 2016.  Plaintiffs have not identified any issues of material fact associated with that accreditation, nor have plaintiffs raised any issues of material fact associated with defendants' testimony as to their belief at the time.

To summarize, even though plaintiffs have produced evidence that calls into question whether Dwyer was accredited in 2016, defendants have provided circumstantial evidence that defendants complied with Regulation D and that defendants reasonably believed Dwyer was accredited in 2016.  Plaintiffs do not dispute any aspects of these underlying facts and instead argue that circumstantial evidence of

---

[132] D.I. 207 at 6 (citations omitted).
[133] 428 F. Supp. 2d 915 (E.D. Ark. 2006).
[134] *Id.* at 921.

compliance with Regulation D is insufficient *as a matter of law*.[135] As a strictly legal

question, plaintiffs' argument is a losing one.

### (iii)    Conclusion

For the reasons discussed, as to plaintiffs' Count I based upon the sale of

unregistered securities to unaccredited investors, the court denies plaintiffs' motion and

grants defendants' motion.

### (b)    Vantage's offering was a private offering

### (i)    Plaintiffs' motion

Plaintiffs move for summary judgment[136] that the Vantage Corporation offering

was not exempted from registration, because it was a public offering.[137]  Plaintiffs

arguments are incoherent and, thus, cannot form a basis for summary judgment.  For

example, in reciting the law, plaintiffs cite Rule 506(b) and argue that the rule "provides

a 'safe harbor' under this statute, and permits the sale of an unlimited amount of

securities provided that:  (1) no 'general solicitation' or advertising is used to market the

securities, and (2) securities are not sold to more than 35 nonaccredited investors."[138]

No such "general solicitation" language appears in Rule 506(b).[139]  Two pages later,

plaintiffs again argue that "[t]he 506(b) exemption is also inapplicable because Vantage

and its agents engaged in a general solicitation of investors with whom the company

---

[135] D.I. 192 at 13; D.I. 207 at 6.  Thus, even though plaintiffs argue that "[d]efendants provide no basis for a reasonable finder of fact to conclude that they had any basis for a reasonable belief that all investors in Vantage were accredited[,]" D.I. 207 at 6, plaintiffs do not dispute any of the evidence identified by defendants and, therefore, provide no basis for a finder of fact to conclude that.

[136] Perhaps, at the meet and confer, the parties could have agreed that defendants would move on the aspects of the claims for which defendants carried a burden.

[137] D.I. 157 at 17, 19.

[138] *Id.* at 17 (citation and footnote omitted).

[139] The court declines to figure out what plaintiffs mean by this argument.

had no pre-existing relationship."[140]  In support, plaintiffs cite (without any explanation) to a case discussing Rule 146(c).[141]  Defendants distinguish plaintiffs' cited cases,[142] to which plaintiffs do not respond.[143]  The court is unable to find any basis for summary judgment and denies plaintiffs' motion.

### (ii)     Defendants' motion

In response to defendants' motion for summary judgment, plaintiffs respond to defendant's brief with a clearer statement of the law and a slightly more coherent explanation of its position.  Plaintiffs puzzlingly make their general solicitation/not private offering argument in three different places of their answering brief.  First, plaintiffs state, again without any explanation, that they rely on Rule 502 for the requirement that "a Rule 506(b) offering may not be accomplished through [a] 'general solicitation[.]'"[144] However, through sloppy citation, plaintiffs seem to imply that Rule 502 states that "solicitations of investments cannot be made to persons with whom the company does not have a 'preexisting substantive relationship.'"[145] This is not stated in the regulation and is, in fact, part of a 1985 SEC No-Action letter.[146]

Second, plaintiffs argue that "Vantage stock was sold through a general solicitation of investors with whom the company had no pre-existing relationship."[147]  In

---

[140] D.I. 157 at 19 (citing *Johnston v. Bumba*, 764 F. Supp. 1263, 1274–75 (N.D. Ill. 1991)).

[141] *Id.*

[142] D.I. 194 at 8.

[143] D.I. 207 at 5–7.  Plaintiffs argue that defendants carry the burden as their registration exemption, *id.* at 6, but at no point in the briefing on plaintiff's motion did plaintiffs bother to follow the procedures defined in FEDERAL RULE OF CIVIL PROCEDURE 56(c).  The court declines to make an independent inquiry into the evidence. Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials[.]").

[144] D.I. 192 at 10.

[145] *Id.*

[146] *Id.*

[147] *Id.* at 13–14.

support, plaintiffs identify deposition testimony related to conduct in 2016, after the Vantage Corporation offering had closed.[148]

Third, plaintiffs also contend that summary judgment as to defendants' private offering arguments is inappropriate, because defendants bear the burden of proof, which plaintiffs assert requires that defendants must "produce evidence of the required exact number and identity of all offerees[.]"[149]  Plaintiffs argue that "[w]hile [d]efendants contend, without any evidentiary support, that Vantage only solicited investments from a small group of accredited and sophisticated investors, the facts indicate that Vantage's agents offered securities indiscriminately to individuals across the country."[150] According to plaintiffs, there is a genuine issue of fact as to whether the Vantage Corporation offering was private.[151]

Defendants reply that "[p]laintiffs present no record evidence or controlling law showing that Vantage conducted a 'general offering.'"[152]  In addition to the cases distinguished in relation to plaintiffs' motion, defendants distinguish the cases cited by plaintiffs in their answering brief and point out that plaintiffs' "anecdotal examples of 'general' solicitations . . . all occurred months after the offering was closed in March 2016 and were unrelated to the sale of Vantage stock."[153]

The court agrees with defendants that there is not a genuine issue of fact that the Vantage Corporation offering was private.  Plaintiffs' "burden" argument seems to place defendants in the untenable position of disproving a negative, however, plaintiffs do not present evidence that "Vantage's agents" offered securities of Vantage Corporation for the 2016 offering "indiscriminately to individuals across the country," and co-mingle

---

[148] *Id.* at 14.
[149] *Id.* at 15 (citing *S.E.C. v. StratoComm Corp.*, 2 F. Supp. 3d 240, 264 (N.D.N.Y. 2014)).
[150] *Id.*
[151] *Id.*
[152] D.I. 209 at 3.
[153] *Id.* (footnote omitted).

alleged communications pertaining to Vantage Corporation and investment in the separate hedge fund.

### (iii)    Conclusion

For the reasons discussed, as to plaintiffs' Count I based upon a public offering of unregistered securities, the court denies plaintiffs' motion and grants defendants' motion.

### (c)    Dwyer is not a "bad actor" under the regulation

Plaintiffs move for summary judgment that the Vantage Corporation offering was not exempted from registration, because Dwyer, who promoted Vantage Corporation stock and was paid compensation for solicitation of purchasers in the offering, is a "bad actor" under Rule 506(d) whose background never was disclosed in writing (or otherwise) to potential investors prior to purchase, thus the exemption fails as a matter of law.[154]

Under Rule 506(d), if the issuer or any other person covered by the Rule has a relevant criminal conviction, regulatory or court order, or other disqualifying event prior to September 23, 2013, an offerer is disqualified from relying on the Regulation D exemptions unless written notice of the disqualifying event is provided to investors.[155]  Plaintiffs argue Dwyer is a covered person under this rule, as it encompasses any persons compensated for soliciting investors.[156]  They contend Dwyer's permanent FINRA ban triggers disqualification as a bar by a securities regulatory industry.[157]  Plaintiffs assert defendants knew or should have known of Dwyer's FINRA ban through the exercise of reasonable care via a simple search for his name on "Broker Check," a publicly available resource provided by FINRA that

---

[154] D.I. 157 at 20 (citing 17 C.F.R. § 230.506(d)).
[155] *Id.* (citing 17 C.F.R. § 230.506(d)).
[156] *Id.* at 20.
[157] *Id.* at 21.

discloses a person's history in the securities industry,[158] and that e-mail correspondence demonstrates defendants were aware of Dwyer's history and that they actively attempted to withhold this information from investors by "scrubbing" his Google search profile and by omitting his last name in communications with potential investors.[159]  Defendants respond that Dwyer's lack of an actual relationship with Vantage Corporation means the exemption stands.[160]

The Rule 506(b) exemption is unavailable if an individual who subject to certain regulatory sanctions "has been or will be paid (directly or indirectly) remuneration for solicitation of purchasers in connection with such sale of securities."[161]  Plaintiffs' reliance on defendants' purported obligation to disclose Dwyer's FINRA ban is based on the assertion that Dwyer was compensated for soliciting investors in the 2016 offering of Vantage Corporation stock.[162]  The evidence demonstrate he was not compensated for such solicitation.

The evidence demonstrates that Dwyer was not ever an officer or employee of Vantage Corporation.[163]  As noted above, much of plaintiffs' briefing on summary judgment discusses Dwyer's conduct from the summer of 2016 and related to the sale of limited partnership interests in a hedge fund, named VF(X) LP.  With regard to remuneration, plaintiffs state "Vantage . . . pa[id] . . . $1 million from funds raised from Vantage investors to Dwyer and to Carr  . . . ."[164]  Plaintiffs do not dispute, however, that Dwyer was paid through VAM, a separate entity created to be the general partner of VF(X) LP, but characterize unconvincingly that payment as "an attempted regulatory workaround [that] does not protect Defendants from the bad

---

[158] *Id.* (citing D.I.159 at A899-A911).
[159] *Id.*
[160] D.I. 194 at 9.
[161] 17 C.F.R. § 230.506(d).
[162] D.I. 157 at 20.
[163] D.I. 169, ex. 44, Nos. 2, 4; D.I. 167, ex. 7, 578:2-15.
[164] D.I. 157 at 21.

actor disqualification."[165]  With regard to solicitation, plaintiffs submit no evidence of any communication between Scott and Dwyer prior to her initial investment.  The only pre-investment communication identified between Carter and Dwyer (with Carr also in attendance) was a meeting in early January 2016 where they touted Vantage Corporation as an investment opportunity and offered to introduce Carter to Askew.[166]  Carter then met with Askew, who told Carter he was looking for "certain types of investors,"[167]  Plaintiffs' next assertion is that "*Askew consistently solicited* Carter to invest in . . . Vantage [Corporation]."[168]  Defendants posit the only class of bad actor that could even tangentially include Dwyer is "promoter," which is defined as one who "directly or indirectly receives in consideration of services or property, or both  services and property, 10 percent or more of any class of securities of the issuer or 10 percent or more of the proceeds from the sale."[169]  Plaintiffs do not present evidence Dwyer is a relevant "promoter" that meets that definition.

The court determines the evidence demonstrates that Dwyer was not a bad actor whose history defendants were required to disclose.

### (i)    Conclusion

For the reasons discussed, as to plaintiffs' Count I based upon Dwyer's status as a "bad actor," the court denies plaintiffs' motion **[**and grants defendants'**]**.

### (d)    Conclusion--Plaintiffs' Count I

Based on all of the reasons discussed, as to plaintiffs' Count I, the court denies plaintiffs' motion in its entirety and grants defendants' motion in its entirety.

---

[165] D.I. 207 at 6.
[166] D.I. 157 at 10 (citing Carter Dep. A13, 42:5-21).
[167] *Id.* (citing Carter Dep. A13, 44:11-46:7).
[168] *Id.* (citing Carter Dep. A10, 33:19-25).
[169] D.I. 194 at 9 (quoting 17 CFR § 230.405).

### C.    Plaintiffs' Count II (Violation of O.C.G.A. § 10-5-20 For the Sale of Unregistered and Non-Exempt Securities Against All Defendants)

Based on the court's determination that defendants did not offer unregistered, non-exempt, securities, as to plaintiffs' Count II, the court denies plaintiffs' motion and grants defendants' motion.

### D.    Plaintiffs' Count III (Violation of O.C.G.A. § 10-5-31)

Under the Georgia Act, "[i]t is unlawful for an individual to transact business in this state as an agent unless the individual is registered under this chapter as an agent or is exempt from registration as an agent under subsection (b) of this Code section."[170] One exemption applies to: "[a]n individual who represents an issuer with respect to an offer or sale of the issuer's own securities . . . and who is not compensated in connection with the individual's participation by the payment of commissions or other remuneration based, directly or indirectly, on transactions in those securities."[171] Another exemption applies to:  "[a]n individual who represents an issuer that effects transactions solely in federal covered securities of the issuer," and imposes certain additional conditions on securities covered under 15 U.S.C. Section 77r(b)(3) or 77r(b)(4)(D)."[172]

Plaintiffs allege that "[a]t the time the stock was offered for sale and sold to Plaintiffs, Askew was not registered as a securities salesperson or an investment advisor with the Georgia Commissioner of Securities as required by § 10-5-1 *et. seq.*"[173] and that "[u]pon information and belief, Askew received direct or indirect compensation for his role in soliciting investments in Vantage Corporation."[174]  "Vantage Corporation's Subsidiaries and Gerald Finegold are liable to Plaintiffs for the acts of Askew because

---

[170] O.C.G.A. § 10-5-31(a).  "Agent" is defined under the statues as "an individual, other than a broker-dealer, who represents a broker-dealer in effecting or attempting to effect purchases or sales of securities."  O.C.G.A. § 10-5-2(1).

[171] O.C.G.A. § 10-5-31(b)(3).

[172] O.C.G.A. § 10-5-31(b)(5).

[173] D.I. 16 at ¶ 68.

[174] *Id.* at ¶ 69.

they participated in these acts, because of the doctrine of respondeat superior, or because each was a control person with respect to Askew."[175]

### 1.    Plaintiffs' motion

Plaintiffs move for summary judgment as to Askew and argue he qualifies as an individual who should have been registered under the statute, as his attempts "to effect purchases or sales of securities" are clear from the record.[176]  They argue Askew was not exempt from registration because he was compensated for bringing in investors to Vantage and received over $1 million personally, or through his wholly owned company, that were derived from investor funds.[177]

### 2.    Defendants' motion

Defendants move for summary judgment and argue Askew was exempt from the registration requirement under both O.C.G.A. § 10-5-31(b)(3) and O.C.G.A. § 10-5-31(b)(5).[178]  They argue Askew is exempt under subsection (b)(3) because it is undisputed that Askew, as a director and founder represented Vantage with respect to the offering of its own shares.[179]  Defendants also argue no payments were made to Askew in any way related to the sale of Vantage stock; the only payments to Askew were for work done on behalf of Vantage pursuant to a contract, and as compensation as an officer and employee of Vantage, not as compensation in connection with the sale

---

[175] *Id.* at ¶ 71.

[176] D.I. 157 at 24; *see also* D.I. 207 at 8 (incorrectly citing O.C.G.A. § 10-5-*32*(a), the section addressed to "investment advisors," not O.C.G.A. § 10-5-*31*(a), addressed to "agents").  Plaintiffs also confusingly cite O.C.G.A. § 10-5-31(b)(3), the section describing a specific *exemption* for "agents" addressed in § 10-5-31(a), for the proposition that "[o]fficers or directors of companies qualify as 'agents' and must be registered as such if they perform the functions of an agent, and if they are compensated directly or indirectly for making sales."  D.I. 157 at 23-24.

[177] D.I. 157 at 24 (referring the court to record citation earlier in its brief at § II(A)(ii)).

[178] D.I. 164 at 28-29.

[179] *Id.*

of Vantage Corporation securities.[180]  The argue Askew is exempt under subsection (b)(5) because, as a director of Vantage Corporation,[181] Askew represented Vantage with respect to the offering of its own shares, which are federally covered securities pursuant to 15 U.S.C. § 77r(b)(4)(f).[182]

### 3.    Analysis

The primary dispute as to Askew's liability for not registering as an agent rests on whether Askew was compensated, directly or indirectly, in connection with the sale of Vantage Corporation securities.  Each side cite facts concerning payments made to Askew that at least raise a genuine issue of material fact as to whether those payments were made in direct or indirect compensation in connection with the sale of Vantage Corporation securities.  Perhaps accepting this reality, defendants respond to plaintiffs' motion by merely reciting the subsection (b)(3) and (b)5 exemptions in a footnote,[183] and only present attorney argument, bare citation to the record, and a footnote-cite to an unhelpful case from the Supreme Court of North Dakota[184] in their reply brief.

### 4.    Conclusion

For the reasons discussed above, as to Plaintiffs' Count III, the court denies both plaintiffs' and defendants' motions.

### E.    Plaintiffs' Count IV (Violation by All Defendants of Section 12 of the 1933 Act, 15 U.S.C. § 77l(a)(2), Because of Misrepresentations in Connection with Issue of a Security)

Section 12(a)(2), which prohibits misleading statements of material fact or omissions in a prospectus or oral communication with regard to securities, does not

---

[180] *Id.* at 29 (D.I. 169, ex. 43 at Herbert_Miller_000043-45 (Vantage entities general ledger listing all cash transactions for the year 2016)).

[181] D.I. 25 at ¶ 8.

[182] D.I. 164 at 28.

[183] D.I. 194 at 7 n.10.

[184] D.I. 209 at 5 (citing *State v. Hager*, 790 S.W. 2d 745 (N.D. 2010).  The court again notes its frustration with the parties' briefing; *Hager* is reported in the North Western Reporter ("N.W."), not the South Western Reporter ("S.W.") as defendants cite the case.

apply to the private sale of securities.[185]  "[T]he distinction drawn in *Gustafson* is to determine not which *types* of securities are exempt from Section 12(a)(2) but, rather, which *transactions* are exempt from the statute.[186]  Where the evidence shows that the Plaintiff purchased his or her securities pursuant to a private sale agreement, there can be no cause of action.[187]

In light of the courts' determination that plaintiffs purchased their Vantage Corporation stock via a private sale, as to plaintiffs' Count IV, the court denies plaintiffs' motion and grants defendants'.  As a result of Counts I and IV being dismissed, plaintiffs' motion for summary judgment that they are entitled to rescission of the remaining $3.45 million they paid for their Vantage Corporation stock[188] is denied.

### F.    Plaintiffs' Count V (Breach of Fiduciary Duty); Count VI (Negligence)

Plaintiffs' Count V and VI allege substantially identical fiduciary duty and negligence claims:  Askew "owed a fiduciary duty [/ duty of care] to Plaintiffs of purchasers of securities";[189] "[t]he officers and directors of Vantage Corporation owed a fiduciary duty [/ duty of care] to the company's [/ its] stockholders, including Plaintiffs";[190] Askew / Vantage Corporation "violated its fiduciary duty [/ duty of care] to Plaintiffs based upon the acts and omissions, set forth in paragraphs 12 through 52 [of the FAC]";[191] and, "Vantage Corporation's Subsidiaries and Finegold are liable to Plaintiffs

---

[185] *Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co.*, 652 F. Supp. 2d 576, 596 (E.D. Pa. 2009) (citing *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561 (1995)).

[186] *Emergent Capital Inv. Management, LLC v. Stonepath Group, Inc.*, 165 F. Supp. 2d 615, 622 (S.D.N.Y., 2001) (emphasis added).

[187] *See Id.* (granting summary judgment to defendant for Section 12(a)(2) claim because "the Stock was sold not by prospectus but by private placement."); *see also Walish v. Leverage Group, Inc.*, No. 97–5908, 1998 WL 314644, at *5 (E.D. Pa. June 15, 1998) ("*Gustafson* clearly states that Section 12(2) does not apply to private sales of securities.").

[188] D.I. 157 at 26-27; D.I. 16 at ¶¶ 61, 79.

[189] D.I. 16 at ¶¶ 81, 87.

[190] *Id.* at ¶¶ 82, 88.

[191] *Id.* at ¶¶ 83, 89.

for Vantage Corporation's breach of its fiduciary duties [/ negligence] because they participated in these acts and/or because of the doctrine of respondeat superior."[192]

### 1.    Defendants' Motion

Defendants move for summary judgment on Count V and argue defendants' actions are protected by the business judgment rule.[193]  They move for summary judgment on Count VI and argue dismissal is warranted because the negligence claim is merely duplicative of Count V as it is based on the same facts and, therefore must be dismissed for the same reasons.[194]

Plaintiffs response is a simple declaration that "Defendants' self-dealing via the 'sale' of software to Askew's company for $1,000,000 and gross misuse of investor funds for their benefit raises a factual question as to whether they breached the duty of loyalty owed to Plaintiffs as shareholders[,]" and "[d]irectors of a company also owe a duty of disclosure to shareholders," supported by citation to cases supporting the general stated propositions.[195]

### 2.    Analysis

Plaintiffs make no attempt to support Counts V and VI of their complaint.  The FAC refers generally to forty paragraphs for actions allegedly constituting breaches by defendants.  The entirety of their answering brief is two sentences; one making an unsupported conclusion that investor funds were improperly spent on software, the

---

[192] *Id.* at ¶¶ 85, 92.
[193] D.I. 164 at 31-34.
[194] *Id.* at 34 (citing *Pavilon Hotel Corp. v. Koch*, 2000 U.S. Dist. LEXIS 378, 2000 WL 51817, at *2 (N.D. Ill. Jan. 14, 2000) (dismissing a breach of fiduciary duty claim as duplicative of a negligence claim because the causes of action are supported by the same operative facts and allege the same injury); *Albert v. Alex. Brown Mgmt. Servs.*, Nos. 04C-05-250 PLA, 04C-05-251 PLA, 2004 Del. Super. LEXIS 303, at *7 (Super. Ct. Sep. 15, 2004) ("Plaintiff's negligence allegation is more aptly stated as breach of the [fiduciary] duty of care.").
[195] D.I. 192 at 19 (citing *Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988); *QC Commc'ns Inc. v. Quartarone*, 2014 WL 3974525, at *11 (Del. Ch. Aug. 15, 2014); *In re Reliance Sec. Litig.*, 135 F. Supp. 2d 480, 520 (D. Del. 2001)).

other, merely setting forth the unremarkable proposition that directors owe a fiduciary duty of disclosure to company stockholders.  There is absolutely no legal analysis, or any reference directing the court to the specific actions that potentially raise a genuine issue of fact, to support these claims.

### 3.    Conclusion

For the reasons discussed above, as to Plaintiffs' Counts V and VI, the court grants defendants' motion.

### H.    Plaintiffs' Count VII (Accounting)

Plaintiffs allege that that "Vantage Corporation owes fiduciary duties to its shareholders,"[196] and that it "is required to provide access to its[, and its subsidiaries',] books and records upon demand of its shareholders." [197]  Despite their request, plaintiffs allege "Vantage Corporation has refused to provide Plaintiffs access to the company's books and records, including information on where and how their investments have been utilized."[198]  Because "[t]he sole means of ascertaining such information and documentation are within the control of Vantage Corporation, [a]n accounting is required to determine the amount of money owed to Plaintiffs."[199]

Delaware courts view a "cause of action" for accounting "as [a] request[] for specific remedial relief."[200]  Therefore, the viability of plaintiffs' claim for accounting "depends upon the success of Plaintiff's [substantive] claims."[201]

Defendants argue they are entitled to summary judgment on all of plaintiffs' substantive claims and, thus, plaintiffs' accounting claim must fall with those substantive

---

[196] D.I. 16 at ¶ 94.
[197] *Id.* at ¶ 95.
[198] *Id.* at ¶ 96.
[199] *Id.* at ¶¶ 97-98.
[200] *Seiden v. Kaneko*, C.A. No. 9861-VCN, 2015 WL 7289338, at *14 n.166 (Del. Ch. 2015) (citing *Cochran v. F.H. Smith Co.*, 174 A. 119, 121 (Del. Ch. 1934) (discussing "the equitable remedy of an accounting.")).
[201] *Id.*

claims.[202]  Plaintiffs assert because defendants are not entitled to summary judgment

on all of plaintiffs' claims, they are not entitled to summary judgment on this claim.[203]

Because the court has determined defendants are not entitled to summary

judgment on all of plaintiffs' claims, as to Count VII, the court denies defendants' motion

for summary judgment.

### I.    Plaintiffs' Count VIII (Violation of §10b-5 of the 1934 Act and Rule 10b-5 (Securities Fraud) Against All Defendants); Plaintiffs' Count IX Violation of O.C.G.A. § 10-5-50 et. seq. (Securities Fraud) Against All Defendants; Plaintiffs' Count X (common law fraud)

Plaintiffs' 10b-5 claim requires plaintiffs to prove six elements:

(1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; 4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation"; (5) economic loss; and (6) "loss causation," i.e., a causal connection between the material misrepresentation and the loss.[204]

Plaintiffs' federal securities claim alleges that

Askew deceived Carter and Scott by making untrue statements of material facts and/or omitting to state material facts necessary to make the statements not misleading, and/or substantially participated in the creation of the alleged misrepresentations, which operated as a fraud and deceit upon Plaintiffs in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.[205]

Specifically,

Askew falsely represented (1) the status and resources of Vantage Corporation, assuring Plaintiffs that Vantage Corporation had ownership of software, systems, and intellectual property needed for the trading activity of the proposed business model; (2) the intended use of the investments, assuring Plaintiffs that 70% of each investment in Vantage Corporation was to be invested in an investment account for the benefit of each

---

[202] D.I. 164 at 34.
[203] D.I. 192 at 19.
[204] *McCabe v. Ernst & Young, LLP*, 494 F.33 418, 424 (3d Cir. 2007) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)).
[205] D.I. 16 at ¶ 100.

individual; (3) Plaintiffs' acquired role in Vantage Corporation, assuring Plaintiffs that they would have a general partnership interest.[206]

"Askew acted with the requisite intent to deceive and defraud and with knowledge of, or reckless disregard, for the truth."[207] "Vantage Corporation's Subsidiaries and Gerald Finegold are liable to Plaintiffs for the acts of Askew because they participated in these acts, because of the doctrine of respondeat superior or because each was a control person with respect to Askew."[208]

Plaintiffs' O.C.G.A. § 10-5-50 and common law fraud claims make substantially identical allegations.[209]

### 1.    Defendants' motion

Defendants move for summary judgment and argue plaintiffs cannot prove reasonable reliance on material misrepresentations or loss causation.[210] With regard to those elements, defendants respond to five groups or types of alleged misrepresentations on which they claim to reasonably rely:[211] (1) "[p]laintiffs have no actionable claim arising out of "the use of investor funds";[212] (2) "[p]laintiffs cannot, as a matter of law, recover on allegations of misrepresentations as to predicted treading returns";[213] (4) "[p]laintiffs complained that the investment documents they signed did not accurately represent the investment structure they thought would be in place";[214] "[t]here is an identical lack of support for [p]laintiffs' fourth category of alleging that at least some of their funds were to be held in a segregated account";[215] and, (5)

---

[206] *Id.* at ¶ 102.
[207] *Id.* at ¶¶ 103-04.
[208] *Id.* at ¶ 108.
[209] *See id.* at ¶¶ 110-18; 120-126.
[210] D.I. 164 at 21.
[211] *Id.* at 23 (D.I. 169, exs. 45 No. 1, 46 No. 1).
[212] *Id.*
[213] *Id.* at 23-24.
[214] *Id.* at 24-25.
[215] *Id.* at 25.

"[p]laintiffs claim it was misrepresented that Vantage held 100% ownership of the software and intellectual property needed for its business model."[216]

Defendants also argue plaintiffs cannot prove the loss they allege was proximately caused by defendants' actions, the required link between the alleged misrepresentation and the cause of the alleged loss.[217]  They assert "Plaintiffs cannot articulate how any purported misrepresentations caused a decline in the value of their investment[,]" and that "plaintiffs' alleged losses sere self-inflicted[,]" i.e., by their "decision to approach the SEC knowing it would 'kill' Vantage's ability to seek additional investors."[218]

Plaintiffs argue defendants are not entitled to summary judgment on these claims "because the existence of reasonable reliance and proximate cause is a disputed material fact."[219]  They assert whether they "reasonably relied on Defendants misstatements involves questions of fact for the jury to decide."[220]  They also note their claim "for damages resulting from Defendants' failure to disclose material facts, such as the financial condition of Vantage or the intended use of investor funds, and Plaintiffs' reliance is presumed with respect to such omissions."[221]  Plaintiffs also maintain a genuine issue of fact also exists as to loss causation.[222]  They argue "Defendants' serial misrepresentations both caused Plaintiffs to purchase the securities (transactional

---

[216] *Id.* at 26.

[217] *Id.*

[218] *Id.* at 27 (D.I. 168, ex. 22).

[219] D.I. 192 at 16.

[220] *Id.* (citing *Block Fin. Corp. v. Inisoft Corp.*, 2006 WL 3240010, at *3 (Del. Super. Ct. Oct. 30, 2006) ("[T]he question of reliance, particularly whether it was reasonable, is generally a question of fact that cannot be determined on summary judgment.").

[221] *Id.* at 16-17 (citing *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972)).

[222] *Id.* at 18.

causation) *and* ultimately caused those securities to be worthless, causing significant financial harm to Plaintiffs (loss causation).[223]

### 2.    Analysis

"The question of materiality is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor."[224]  "A material misrepresentation or omission is actionable if it significantly altered the total mix of information made available."[225]  In the context of Rule 10b–5 claims, the Third Circuit has stated

> The obligation of due care must be a flexible one, dependent upon the circumstances of each case.  We require only that the plaintiff act reasonably.  Since the failure to meet that standard is in the nature of an affirmative defense, the burden of proof rests upon the defendant.  Such matters as [1] fiduciary relationship, [2] opportunity to detect the fraud, [3] sophistication of the plaintiff, [4] the existence of long standing business or personal relationships, and [5] access to the relevant information are all worthy of consideration.[226]

It is proper, however, to grant defendants' motion for summary judgment if the court finds plaintiffs' reliance is unreasonable based on the facts of the case.[227]

"In order to satisfy the loss causation requirement in . . . [a] § 10(b) action[], the plaintiff must show that the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss."[228]  Plaintiffs need only show the alleged misrepresentation "was *a* proximate cause—*not the sole cause*—of the loss."[229]

---

[223] *Id.* at 18-19.
[224] *Ieradi v. Mylan Labs., Inc.*, 230 F. 3d 594, 599 (3d Cir. 2000).
[225] *In re Wilmington Trust Sec. Litig.*, 852 F. Supp. 2d 477, 488 (D. Del. 2012).
[226] *Straub v. Vaisman & Co.,* 540 F. 2d 591, 598 (3d Cir. 1976) (footnote omitted).
[227] *See, e.g.*, *Tracinda Corp. v. DaimlerChrysler AG*, 364 F. Supp. 2d 362, 406 (D. Del. 2005).
[228] *McCabe v. Ernst & Young, LLP.*, 494 F.3d 418, 426 (3d Cir. 2007).
[229] *Pure Earth, Inc. v. Call*, 531 Fed. App's 256, 261 (3d Cir. 2013) (emphasis added) (citing *McCabe*, 494 F.3d at 432).

The plaintiffs' fraud-based claims rest on whether they reasonably relied on purported misrepresentations that were a proximate cause of their loss. The court finds that as a matter of law, they did not reasonably rely on any purported misrepresentations, and those purported misrepresentations were not the proximate cause of plaintiffs' loss.

Plaintiffs argue defendants made "serial misrepresentations" that caused them to purchase Vantage Corporation securities and caused those securities to be worthless; thus, causing financial harm to plaintiffs. The record does not support those arguments.

Defendants presented evidence and argument to support their arguments rebutting the five groups, or types, of alleged misrepresentations on which plaintiffs claim to have reasonably and actually relied.[230] The Investment Term Sheet disclosed "the use of investor funds."[231] Plaintiffs cannot, as a matter of law, recover on allegations of misrepresentations as to predicted trading returns because general statements of optimism "constitute no more than 'puffery' and are understood by reasonable investors as such."[232] Plaintiffs' complaints that the investment documents they signed did not accurately represent the investment structure they thought would be in place are without merit because plaintiffs had access to, and could review, the

---

[230] D.I. 169, ex. 45 No. 1 (listing "use of investor funds"; "predicted returns to be derived from and investment in Vantage" and "Vantage never lost money in the stock market"; "the supposed segregated accounts for the benefit of investors . . . that Plaintiffs would become 'General Partners' of Vantage, and a 'General Partner' trading account would be established for their benefit"); *id.*, ex. 46 No. 1 (listing "the use of investor funds; the trading and investment history of Vantage Corporation; the supposed "audits" of said investment history; the supposed segregated accounts for the benefit of investors; the amount of funds raised from outside investors; the predicted returns to be derived from an investment in Vantage; that Vantage never lost money in the stock market; that Plaintiffs would become 'General Partners' of Vantage, and a 'General Partner' trading account would be established for their benefit"); *id.*, ex. 47 No. 9 (listing "that Vantage did not have ownership of the proprietary software required for the business model presented to Plaintiffs")).

[231] D.I. 164 at 23 (citing D.I.167, ex. 10 at VantageCorporation 004218).

[232] *Id.* (citing *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 283 (3d Cir. 2010)).

transaction documents themselves prior to investing.[233]  Additionally, a Carter tax advisor informed him "that Vantage Corporation "is an S Corporation, not a partnership," and "[t]here are no General Partnership interests that I know about."[234]

Defendants argue each of the *Straub* factors weigh in favor of finding plaintiffs' reliance on purported "partnership statements" were unreasonable as a matter of law: (1) no fiduciary relationship between plaintiffs and Askew prior to the stock purchases; (2) plaintiffs had ample opportunity to "detect" the misrepresentations by simply reading the transaction documents; (3) plaintiffs represented they were sophisticated; (4) there was no long-standing business or personal relationship between plaintiffs and Askew; and, (5) plaintiffs had access to the relevant information by reading the transaction documents.[235]

Defendants argue plaintiffs' allegation that at least some of their funds were to be held in a segregated account is nonsensical because that is not how stock ownership works, and none of the governing documents support this claim for segregation.[236] Finally, defendants rebut plaintiffs claim that Askew misrepresented to them that Vantage Corporation owned 100% ownership of the software and intellectual property needed for its business model by referencing testimony that Vantage did own the necessary IP to run the business; Finegold's purported confirmation that, even though future payments were to be made to a related entity, by January 1, 2016; and Scott's concession she did not know whether Vantage Corporation had everything it needed to operate.[237]  Moreover, there is no evidence that Vantage Corporation did not own or have access to the software for use in its business operations at the time of plaintiffs' investment.[238]

---

[233] *Id.* at 24 (citing *In re Wilmington Trust Sec. Litig.*, 852 F. Supp. 2d at 488).
[234] *Id.* at 25 (citing D.I. 168, ex. 33 at Scott_Carter_003096).
[235] *Id.* at 24-25 (citing *Straub*, 540 F.2d at 598).
[236] *Id.* at 25.
[237] *Id.* at 26 (citing Carter and Scott testimony).
[238] *Id.*

Despite defendants' specific responses to plaintiffs' stated alleged misrepresentations, plaintiffs provide no direct reply to each.  They merely declare that "[m]any of the *Straub* factors noted by Defendants are disputed, including whether Plaintiffs could have detected the fraud, their access to relevant information, and their sophistication," and conclude:  "[a]s a result, Defendants' statements that influenced Plaintiffs to continue to hold their investments, even if made after their initial purchases, are relevant for establishing their state securities fraud claims."[239]  Plaintiffs' lack of responding with record evidence to support their claims is fatal to those claims.

Separately, plaintiffs do not show there is a genuine issue of material fact as to loss causation.  Although plaintiffs need only identify a genuine issued of material fact as to whether "the defendant misrepresented or omitted *the very facts* that were a substantial factor in causing the plaintiff's economic loss,"[240] they have not done so.  The *McCabe* court explained:

> [I]f false statements are made in connection with the sale of corporate stock, losses due to a subsequent decline in the market, *or insolvency of the corporation brought about by business conditions or other factors in no way relate[d] to the representations will not afford any basis for recovery.* It was only where the fact *429 misstated was of a nature calculated to bring about such a result that damages for it can be recovered.[241]

Vantage Corporation's bankruptcy ultimately caused plaintiffs' shares to lose their value.  Plaintiffs assert "Defendants made misrepresentations as to the use of investors' funds and the financial position of the company; those misrepresentations were false and

---

[239] D.I. 192 at 17.  The court notes it has ruled as to the investors' sophistication. Plaintiffs also do not explain how any alleged statements prompted them to maintain investment in Vantage Corporation stock which the Stock Subscription Agreement informed investors "there is no public market for the Shares" and that "there can be no assurance that . . . a public market for the Shares will develop[.]"  D.I. 168, ex. 41 at 8, 10.

[240] *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 426 (3d Cir. 2013) (emphasis added).

[241] *Id.* at 428-29 (alterations in original) (emphasis added) (quoting W. Page Keeton et al., Prosser & Keeton on the Law of Torts § 110 (5th ed.1984)).

ultimately contributed to the devaluation of Plaintiffs' stock when Vantage failed."[242]
The court first notes Finegold's letter is dated March 3, 2017, long after plaintiffs'
investment and, therefore, cannot constitute a material misrepresentation in connection
with their stock purchases.  Left unexplained is how the letter, even if it contained
material misrepresentations, caused Vantage to fail, or how it was a factor in plaintiffs
retaining stock for which there was no public market.  Also damning to plaintiffs' position
is

Carter's November 16, 2017 e-mail to counsel:

> All--I am told the SEC has completed their investigation and notified
> Vantage they are dropping their inquiries and the case.

> I need some sort of signal or opinion that the course of action has merit.  I
> find the situation of paying massive legal fees vs. defendants with no
> assets to be untenable.  *The strategy was to file these complaints to force
> a settlement* . . . I don't foresee this outcome.  please help me understand
> what our current strategy is?[243]

The court finds, therefore, plaintiffs fail to support the loss causation element of
their fraud claims as a matter of law.

### 3.    Conclusion

For the reasons discussed, as to plaintiffs' Counts VIII, IX, and X, defendants'
motion is granted.

### Parties' Motions for Summary Judgment on Defendants' Counterclaims

Defendants move for summary judgment on their remaining Counterclaims I-III,
and V, alleging Breach of Contract, Breach of Express Warranties, Breach of Implied
Covenant of Good Faith and Fair Dealing, and Breach of Contract by Scott,

---

[242] D.I. 192 at 19 (citing D.I. 195 at B4-B11 (letter from Finegold to "Stockholders"
reporting on Vantage Corporation and attaching financial statements for the year ended
December 31, 2016 (Mar. 3, 2017)).
[243] D.I. 168, ex. 40 at Scott_Carter_010134 (e-mail from Carter to Peter
Anderson, Larry Polk, Amanda Griffin, Mimi Scott (Nov. 16, 2019)) (emphasis added)
(omission in original).

respectively.[244]  Counterclaims I and III are alleged against Scott and Carter for breaches of the Stock Subscription Agreement and the Stockholders Agreement; Counterclaim II is alleged against Scott and Carter for breach of representations and warranties contained in the Stock Subscription Agreement, and Counterclaim V is alleged against Scott for breach of the Stock Transfer Agreement.  Plaintiffs cross-move for summary judgment on these Counterclaims.[245]

In the Stock Subscription Agreement, each plaintiff "represents and warrants" that:

> "[E]ither alone or with the assistance of the undersigned's professional advisors, has such knowledge and experience in financial and business matters that the undersigned is capable of evaluating the merits and risks of the undersigned's purchase of the Shares";
>
> "[H]as sufficient financial resources to be able to bear the risk of the undersigned's investment in the Shares"; and
>
> "[T]he undersigned is purchasing the Shares for the undersigned' s own account for investment purposes and not with a view toward the sale or distribution of all or any part of the Shares."[246]

Each represented that they

> understand[] that . . . there is no public market for the Shares" and that "there can be no assurance that . . . a public market for the Shares will develop," and acknowledged they had "CAREFULLY READ THE [STOCK SUBSCRIPTION AGREEMENT] AND UNDERSTAND[] THAT IT RELATES TO RESTRICTIONS UPON THE SUBSCRIBER'S ABILITY TO SELL AND/OR OTHERWISE TRANSFER THE SHARES.[247]

Section 5.10 of the Stockholders Agreement, labeled "Further Assurances," provides:  "Each party shall cooperate and take such action as may be reasonably

---

[244] D.I. 161.
[245] D.I. 156; D.I. 157 at 27-35.
[246] D.I. 168, ex. 41 at 7.
[247] *Id.*, ex. 41 at 8, 10.

requested by another party in order to carry out the provisions and purposes of this Agreement and the transactions contemplated by this Agreement."[248]

Section 5.12, labeled "Remedies," provides:

If any party to this Agreement breaches or threatens to commit a breach of its obligations under this Agreement, any party injured or to be injured by such breach, in addition to being entitled to exercise all rights granted by law, including recovery of damages, will be entitled to specific performance of its rights under this Agreement.  The parties agree that the provisions of this Agreement shall be specifically enforceable, it being agreed by the parties that the remedy at law, including monetary damages, for each of such provision will be inadequate compensation for any loss and that any defense in any action for specific performance that a remedy at law would be adequate is waived.  *Should the Company employ an attorney or attorneys to enforce any of its rights under Articles 4 and 5 against any Stockholder and the Company is the prevailing party, such Stockholder shall pay, indemnify and hold the Company harmless from all reasonable costs, damages, and expenses, including attorneys' fees, expended or incurred by the Company.*[249]

## A.    Defendants' Counterclaim I (Breach of Contract)

Defendants allege that "Scott and Carter breached both the Stock Subscription Agreement and Stockholders Agreement" by investing "based upon stated and agreed investment goals, liquidity needs, investment knowledge and understanding of the stock investments they purchased as contained in the Stock Subscription Agreement, Stockholders Agreement and Term Sheet" but "improperly demanded the refund of their investments contrary to the agreed terms of their investment and attempted to tender back their Vantage stock, forcing Vantage, Finegold and Askew to hire counsel to enforce their clear rights under these Agreements," and because they "failed and refused to cooperate with Vantage in contravention of the terms of the Stockholders Agreement, instead demanding redemption of their shares, threatening Vantage and others with legal action, and suing Vantage, Askew, Finegold and Vantage subsidiaries

---

[248] D.I. 167, ex. 11 § 5.10.
[249] *Id.*, ex. 11 § 5.12 (emphasis added).

44

in the underlying action."[250]  These actions constitute a "breach of Section 5.10 of the Stockholders Agreement."[251]

### B.     Defendants' Counterclaim II (Breach of Express Warranties)

Defendants allege that "[b]y demanding redemption of their shares of Vantage [Corporation] stock, by threatening legal action, and by filing the underlying complaint demanding rescission of their purchase of Vantage [Corporation] stock and return of consideration plus interest . . . Scott and Carter have breached the representations and warranties made in the Stock Subscription Agreement."[252]

### C.     Defendants' Counterclaim III (Breach of Implied Covenant of Good Faith and Fair Dealing)

Defendants allege that "[b]y entering into the Stockholders Agreement and the Stock Subscription Agreement, Scott and Carter are subject to the implied covenant of good faith and fair dealing between themselves and Defendants/Counter-Plaintiffs"[253] which each breached because they "invested based upon stated and agreed investment goals, liquidity needs, investment knowledge and understanding of the stock investments they purchased as contained in the Stock Subscription Agreement, Stockholders Agreement and Term Sheet," but "improperly demanded the refund of their investments contrary to the agreed terms of their agreements and attempted to tender their Vantage [Corporation] stock back to Vantage [Corporation], forcing Vantage [Corporation], Finegold and Askew to hire counsel to enforce their rights under these binding contracts" and "when Defendants/Counter-Plaintiffs requested they honor the terms of their agreements and rejected their demand to redeem their shares, [they] threatened to breach and then breached their obligations under the Stockholders Agreement by filing a lawsuit against the Defendants/Counter-Plaintiffs."[254]

---

[250] D.I. 26 at ¶ 44.
[251] *Id.*
[252] *Id.* at ¶ 47.
[253] *Id.* at ¶ 51.
[254] *Id.* at ¶ 53.

### 1.    Defendants' motion

Defendants opening brief concludes with the request for "summary judgment on the counterclaims asserted against Plaintiffs/Counterclaim-Defendants Tera Scott and Wilson Carter,"[255] however, they do not make arguments distinguishing among Counterclaims I, II, and III; separate argument is only made for Counterclaim V.  Other than arguments specific to Counterclaim V, defendants' entire remaining argument is set forth under the heading "Scott and Carter breached Section 5.10 of the Stockholders Agreement by seeking early redemption of shares, disrupting daily Vantage operations, approaching the SEC, and filing suit."[256]  Specifically, they argue plaintiffs breached their agreement to "cooperate and take such action as may be reasonably requested by another party in order to carry out the provisions and purposes of [the Stockholders Agreement] and the transactions contemplated by [the Stockholders Agreement]" in "various ways."[257]

They argue Scott breached § 5.10 by demanding liquidity within six months of her investment, distracting Vantage from its daily operations through continuous harassment, and reneging on her commitment to the long-term investment plans of Vantage Corporation.[258]  Defendants argue Carter breached the same contractual obligations by demanding $1 million in immediate liquidity and joining Scott in her harassment of Vantage.[259]  Defendants argue plaintiffs also breached § 5.10 of the Stockholders Agreement by authorizing counsel to initiate an inquiry with the SEC on their behalf, which effectively terminated Vantage Corporation's ability to raise capital and drove the company into bankruptcy.[260]  They also argue this lawsuit constitutes a

---

[255] D.I. 173 at 10.
[256] *Id.* at 8.
[257] *Id.*
[258] *Id.* at 8-9.
[259] *Id.* at 9.
[260] *Id.*

breach of § 5.10 because legal expenses and distraction associated with the SEC inquiry and this lawsuit interfered with the continued viability of the company.[261]

Responding to defendants' motion as written, plaintiffs state "Defendants have failed to show they are entitled to judgment on Counts I and V of their Counterclaims, and issues of fact preclude any finding in favor of summary judgment for Defendants.[262] Plaintiffs argue defendants are not entitled to summary judgment for breach of the Stockholders Agreement because:  (1) it is void to the extent it limits communications with the SEC,[263] (2) plaintiffs did not breach the agreement,[264] (3) futility excuses any noncompliance with § 5.10,[265] and (4) the proximate cause of defendants' alleged harm turns on disputed facts.[266]

Defendants do not expand on their arguments in their reply brief.[267]

### 2.    Plaintiffs' motion

Plaintiffs move for summary judgment and argue defendants' counterclaims generally allege that plaintiffs caused Vantage Corporation to fail and that they breached certain agreements by seeking rescission of their investments.[268]  They characterize the counterclaims as premised, to a large extent, on the initiation of an SEC investigation of Vantage Corporation in early 2017 but that individuals who report possible securities violations are protected from liability.[269]

They move for summary judgment as to Counterclaim I and argue that, although styled as a single cause of action, the breach of contract claim is based on two separate agreements, the Stock Subscription Agreement and the Shareholders Agreement

---

[261] *Id.*
[262] D.I. 193 at 8-9.
[263] *Id.* at 12-13.
[264] *Id.* at 13-14.
[265] *Id.* at 14.
[266] *Id.* at 14-15.
[267] *See* D.I. 209.
[268] D.I. 157 at 27
[269] *Id.* (citing SEC Rule 21F-17(a)).

having distinguishable provisions and entered between entirely different parties.[270] Plaintiffs maintain Vantage is the only entity with standing to bring a claim for breach of the Stock Subscription Agreement,[271] and plaintiffs did not breach the Stockholders Agreement.[272]  Plaintiffs move for summary judgment as to Counterclaim II and argue that the Stock Subscription Agreement is the only contract at issue that contains a "representation and warranties" provision and defendants claim fails because:  (1) plaintiffs did not make any express warranties to defendants, and (2) defendants did not rely on the Stock Subscription Agreement when deciding to issue stock to plaintiffs.[273] Plaintiffs move for summary judgment as to Counterclaim III and argue that:  (1) neither Askew nor Finegold were parties to the Stock Subscription Agreement on which their claim is partially based, and (2) the facts of the record show that plaintiffs have acted in good faith under the Stockholders Agreement.[274]

Defendants' answering brief asserts their breach of contract counterclaims should proceed to trial.[275]  They respond to plaintiffs' arguments by again arguing plaintiffs violated both the cooperation clause of the Stockholders Agreement and the covenant of good faith arising out of all plaintiffs' agreements.[276]  Because plaintiffs' motion provides specific arguments directed to each of defendants' remaining counterclaims, the court analyzes the parties' arguments based on plaintiffs' briefing on its affirmative motion.

### 3. Analysis

### (a) Counterclaim I

---

[270] *Id.* at 28.
[271] *Id.* at 29.
[272] *Id.* at 29-30.
[273] *Id.* at 30-32.
[274] *Id.* at 32-33.
[275] D.I. 194 at 9-10.
[276] *Id.*

A party asserting a breach of contract claim must prove:  (1) the existence of a contract, (2) a breach of the contract, and (3) that the breach of the contract was the proximate cause of damages.[277]

Plaintiffs argue that Counterclaim I is based on both the Stock Subscription Agreement and the Shareholders Agreement.[278]  They note the Stock Subscription Agreement, containing a representations and warranties provision, was entered into exclusively between Vantage and each plaintiff; Askew and Finegold are not parties to this agreement, and do not have standing to assert claims on this basis.[279]  In contrast, the Stockholders Agreement, to which Askew and Finegold as individuals are named as parties, does not contain any warranties or representations regarding an individual's financial status or ability to bear risk, and instead references generally each party's duty to "cooperate."[280]

The doctrine of privity of contract provides that only parties to a contract may sue to enforce it, and that one not in privity of contract with another lacks standing to assert any claims arising from violations of the contract.[281]  Plaintiffs argue Askew and Finegold cannot recover for a purported breach of the Stock Subscription Agreements because it, unlike the Stockholders Agreement, is exclusively between Vantage and each individual plaintiffs.[282]

Defendants do not respond to plaintiffs' Stock Subscription Agreement privity argument, i.e., that defendants do not have standing to assert a breach of that agreement.  As to the allegations in Counterclaim I that plaintiffs breached the Stock Subscription Agreement, the court grants plaintiffs' motion.

---

[277] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).
[278] D.I. 157 at 28.
[279] *Id.*
[280] *Id.*
[281] *Id.* at 29 (citing *Arrow Fin. Servs., LLC v. Wright*, 715 S.E.2d 725, 727 (Ga. Ct. App. 2011)).
[282] *Id.*

Plaintiff separately argue they did not breach any provision of the Stockholders Agreement.[283]  Contrary to defendants' asserted breach of the obligation to "cooperate" recited in § 5.10 of the Stockholders Agreement, plaintiffs argue they spent months unsuccessfully attempting to obtain information about their investments.[284]  They cite record evidence of waiting months after repeated unsuccessful requests for information to initiate the underlying actions and contend their months-long delay before taking outside actions "is the hallmark of cooperation."[285]  Defendants do not affirmatively respond to plaintiffs' arguments, however, the competing evidentiary record with regard to this allegation precludes granting summary judgment for either party.

### (i)    Conclusion

For the reasons discussed, as to defendants' Counterclaim I, the court grants plaintiffs' motion to the extent it alleges breach of the Stock Subscription Agreement and denies defendants' motion.

### (b)    Counterclaim II

A breach of express warranty claim requires proof that:  (1) a warranty existed; (2) breach of this warranty; and (3) resulting damages.[286]

Plaintiffs argue they did not make any express warranties to Askew or Finegold, and that defendants did not rely on the Stock Subscription Agreement when deciding to issue stock to plaintiffs.[287]

### (i)    Conclusion

---

[283] D.I. 157 at 29.

[284] *Id.*

[285] *Id.* at 29-30.

[286] *Freudenberg Spunweb Co. v. Fibervisions L.P.*, C.A. No. 04C-03-073-FSS, 2006 WL 1064173, at *18 (Del. Super. Ct. Feb. 27, 2006), *aff'd*, 909 A.2d 594 (Del. 2006).

[287] D.I. 157 at 30-31.

The court has ruled that defendants do not have standing to assert a breach based on the Stock Subscription Agreement, and as to defendants' Counterclaim II, thus the court grants plaintiffs' motion and denies defendants' motion.[288]

### (c)    Counterclaim III

While the implied covenant of good faith and fair dealing adheres in every contract, it "cannot be used to circumvent the parties' bargain, or to create a free-floating duty unattached to the underlying legal documents."[289]

Plaintiffs argue defendants' Counterclaim III fails because:  (1) neither Askew nor Finegold were parties to the Stock Subscription Agreement on which their claim is partially based; and (2) the facts of the record show that plaintiffs have acted in good faith under the Stockholders Agreements.[290]

### (i)    Conclusion

For the same reasons explained discussing Counterclaim I, as to defendants' Counterclaim III, the court grants plaintiffs' motion to the extent it alleges breach of the Stock Subscription Agreement and denies defendants' motion.

### D.    Defendants' Counterclaim V (Breach of Contract by Scott)

Defendants allege that through the Stock Transfer Agreements, "Scott released all claims now asserted by her against all the Defendants in the underlying lawsuit and expressly contracted not to file any complaints or lawsuits against the Defendants/Counter-Plaintiffs," and the breach of her obligations thereunder, "including her covenant not to sue these Defendants/Counter-Plaintiffs, damaged defendants."[291]

---

[288] The only mention of the Stockholders Agreement in defendants' Counterclaim III pertains to recovery of damages for breach of the Stock Subscription Agreement.

[289] *Lonergan v. EPE Hldgs., LLC*, 5 A.3d 1008, 1017 (Del. Ch. 2010) (citing *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434 (De. 2005)).

[290] D.I. 157 at 32.

[291] D.I. 26 at ¶¶ 66-67.

Defendants move for summary judgment and argue that, based on the assertion Scott's Stock Transfer Agreements released all her claims against Askew and Finegold, Scott breached those agreements by suing Vantage, Askew, and Finegold.[292]  Plaintiffs move for summary judgment and argue the Stock Transfer Agreements were not valid releases because there was no "mutual assent," and that Scott was fraudulently induced to enter the agreements.[293]

The court explained, above, that Scott did not release her claims with regard to her Vantage Corporation shares she still holds.  The court finds the parties' briefing demonstrates numerous material questions of fact as to whether there was mutual assent and/or fraudulent inducement in connection to Scott's entering the Stock Transfer Agreements.

### (i)    Conclusion

For the reasons discussed, as to defendants' Counterclaim V, the court denies plaintiffs' and defendants' motions for summary judgment.

## IV.    CONCLUSION

For the reasons discussed herein:

1.    plaintiffs' motion for partial summary judgment (D.I. 156) is GRANTED in part, and DENIED in part;

2.    defendants' motion for summary judgment (D.I. 161) is GRANTED in part and DENIED in part; and

3.    defendants/counterclaim-plaintiffs Askew's and Finegold's motion for summary judgment on counterclaims (D.I. 160) is DENIED.

June 17, 2019                                    _____/s/ Mary Pat Thynge_____

                                                                            Chief U.S. Magistrate Judge

---

[292] D.I. 173 at 7.
[293] D.I. 193 at 33-34.